**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| DELYAN SLAVCHEV PEEVSKI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-2334 (TSC) |
| | ) | |
| JANET YELLEN, Secretary, | ) | |
| Department of the Treasury, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER
Assistant Director

STEPHEN M. ELLIOTT (PA Bar# 203986)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Tel: (202) 353-0889
Fax: (202) 616-8470
E-mail: stephen.m.elliott@usdoj.gov

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

I.     Section 7031(c) of the Department of State, Foreign Operations, and Related
Programs Appropriations Act, 2018 (Div. K, Pub. L. No 115-141) .................................. 3

II.    The International Emergency Economic Powers Act ........................................................ 6

III.   Blocking the Property of Persons Involved in Serious Human Rights Abuse or
Corruption ............................................................................................................................ 8

STATEMENT OF FACTS ............................................................................................. 9

I.     The Secretary of State's Section 7031(c) Determination Regarding Peevski ................... 9

II.    OFAC's Designation of Plaintiffs Pursuant to Executive Order 13818 ........................... 10

III.   Plaintiffs' Petition for Reconsideration of OFAC's Designations .................................... 11

IV.   Litigation Procedural History ........................................................................................... 12

STANDARD OF REVIEW ........................................................................................... 14

ARGUMENT ................................................................................................................. 16

I.     State's Interpretation of Section 7031(c) did not Violate the APA (Count I) ................... 16

       A.    *Chevron* Deference .............................................................................................. 17

       B.    The Secretary's Section 7031(c) Determination Qualifies for *Chevron*
Deference ............................................................................................................. 18

       C.    Section 7031(c) is Silent about the Scope of the Term "Officials" .................... 18

       D.    The Court Should Defer to State's Permissible Interpretation of the Term
"Officials" in Section 7031(c) ............................................................................. 19

II.    Non-Statutory (Ultra Vires) Review is Not Appropriate (Count II) ................................. 23

III.   Peevski's Challenge to the Propriety of the Secretary's Section 7031(c)
Determination is not Justiciable (Count III) ..................................................................... 24

       A.    Congress Has Expressly Foreclosed Judicial Review of Section 7031(c)
Determinations ..................................................................................................... 25

B.   Plaintiffs Cannot Challenge the Secretary's 7031(c) Determination.................... 27

C.   Plaintiffs Similarly Cannot Use the APA as a Vehicle to Challenge Peevski's Section 7031(c) Designation ................................................................ 28

　　1.   The Nature and Consequences of Peevski's Section 7031(c) Designation Preclude this Court's Review ................................. 29

　　2.   Section 7031(c) Designations Constitute Agency Decisions Committed to the Department of State's Discretion................................ 32

D.   A Member of this Court has Held that Plaintiff's Challenge to the Secretary's Section 7031(c) Designation is Not Justiciable .................................................... 34

IV.   Treasury did not Violate the APA by Designating Peevski and the Companies He Owns or Controls (Count III) ........................................................................ 35

A.   OFAC's Designations are Entitled to Substantial Deference ............................. 36

B.   OFAC Supported Plaintiffs' Designations with More than Adequate Unclassified Evidence.................................................................................... 38

V.   Plaintiffs Received Sufficient Information to Meaningfully Petition OFAC for Reconsideration (Count IV).............................................................................. 39

CONCLUSION.................................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967) ........................................................................................ 32

*Airmotive Eng'g Corp. v. FAA*,
  882 F.3d 1157 (D.C. Cir. 2018) ....................................................................... 39

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
  686 F.3d 965 (9th Cir. 2012) ..................................................................... 41, 42

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ........................................................................................... 42

*Am. Nat'l Ins. Co. v. FDIC*,
  642 F.3d 1137 (D.C. Cir. 2011) ................................................................... 14-15

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006) ......................................................................................... 15

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ........................................................................... 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 15

*Barnhart v. Walton*,
  535 U.S. 212 (2002) ................................................................................... 18, 21

*Bautista-Rosario v. Mnuchin*,
  568 F. Supp. 3d 1 (D.D.C. 2021) ................................................................ 34, 35

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................... 15

*Beshir v. Holder*,
  10 F. Supp. 3d 165 (D.D.C. 2014) ................................................................... 43

*Biden v. Texas*,
  142 S. Ct. 2528 (2022) ..................................................................................... 32

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ................................................................... 29, 30, 31, 35

*Brownell v. We Shung*,
  352 U.S. 180 (1956) ................................................................................... 26, 31

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.,
  467 U.S. 837 (1984) .......................................................................... 17

Citizens to Preserve Overton Park, Inc. v. Volpe,
  401 U.S. 402 (1971) .......................................................................... 36

City of Arlington v. FCC,
  569 U.S. 290 (2013) ..................................................................... 17, 19

City of Huntington v. U.S. Dep't of Hous. & Urb. Dev.,
  466 F. Supp. 3d 30 (D.D.C. 2020) .................................................... 36

Conant v. Wells Fargo Bank, N.A.,
  60 F. Supp. 3d 99 (D.D.C. 2014) ...................................................... 16

Conf. of State Bank Supervisors v. Off. of Comptroller of Currency,
  313 F. Supp. 3d 285 (D.D.C. 2018) ................................................... 24

Conservation Force, Inc. v. Jewell,
  733 F.3d 1200 (D.C. Cir. 2013) ........................................................ 42

Dames & Moore v. Regan,
  453 U.S. 654 (1981) ........................................................................... 6

FBME Bank Ltd v. Lew,
  125 F. Supp. 3d  109 (D.D.C. 2015) .................................................. 42

Fed. Express Corp. v. U.S. Dep't of Com.,
  39 F.4th 756 (D.C. Cir. 2022) ........................................................... 23

*Fiallo v. Bell,
  430 U.S. 787 (1977) ..................................................................... 24, 25

Fla. Power & Light Co. v. Lorion,
  470 U.S. 729 (1985) .......................................................................... 36

Fox v. Clinton,
  684 F.3d 67 (D.C. Cir. 2012) ....................................................... 17, 18

*Harisiades v. Shaughnessy,
  342 U.S. 580 (1952) .............................................................. 25, 30, 34

Heckler v. Chaney,
  470 U.S. 821 (1985) .......................................................................... 32

Hinton v. Corr. Corp. of Am.,
  624 F. Supp. 2d 45 (D.D.C. 2009) .................................................... 15

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ........................................................................................................ 37

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   219 F. Supp. 2d 57 (D.D.C. 2002) ............................................................................ 37, 42

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003) ................................................................................... 37, 42

*Islamic Am. Relief Agency v. Gonzales*,
   477 F.3d 728 (D.C. Cir. 2007) ....................................................................................... 36

*Jifry v. FAA*,
   370 F.3d 1174 (D.C. Cir. 2004) ..................................................................................... 41

*Kadi v. Geithner*,
   42 F. Supp. 3d 1 (D.D.C. 2012) ..................................................................................... 16

*\*Karadzic v. Gacki*,
   602 F. Supp. 3d 103 (D.D.C. 2022) ............................................................................... 37

*Kerry v. Din*,
   576 U.S 86 (2015) .......................................................................................................... 25

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) ....................................................................................................... 32

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ....................................................................................................... 25

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ....................................................................................................... 14

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ......................................................................................................... 24

*Matthew A. Goldstein, PLLC v. U.S. Dep't of State*,
   153 F. Supp. 3d 319 (D.D.C. 2016), *aff'd*, 851 F.3d 1 (D.C. Cir. 2017) ..................... 24

*Mattwaoshshe v. United States*,
   557 F. Supp. 3d 28 (D.D.C. 2021) ................................................................................ 15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................................................... 36, 39

*\*Nkrumah v. Pompeo*,
   No. 20-CV-01892 (RJL), 2020 WL 6270754 (D.D.C. Oct. 26, 2020) ................. 27, 28, 33

*Nyunt v. Chairman, Broad. Bd. of Governors*,
  589 F.3d 445 (D.C. Cir. 2009) ............................................... 23

*\*Olenga v. Gacki*,
  507 F. Supp. 3d 260 (D.D.C. 2020) ........................................ 37

*Orvis v. Brownell*,
  345 U.S. 183 (1953) ............................................................ 6

*Pejcic v. Gacki*,
  No. 19-2437 (APM), 2021 WL 1209299 (D.D.C. Mar. 30, 2021) ........... 37

*Ping v. United States*,
  130 U.S. 581 (1889) ........................................................... 30

*Propper v. Clark*,
  337 U.S. 472 (1949) ............................................................ 6

*Rai v. Biden*,
  567 F. Supp. 3d 180 (D.D.C. 2021) ........................................ 27

*Rakhimov v. Gacki*,
  No. 19-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020)............ 37, 42

*Regan v. Wald*,
  468 U.S. 222 (1984) ............................................................ 6

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997) ......................................................... 19, 22

*\*Saavedra Bruno v. Albright*,
  197 F.3d 1153 (D.C. Cir. 1999) ..................................... *passim*

*Sackett v. EPA*,
  566 U.S. 120 (2012) ........................................................... 29

*Sierra Club v. Jackson*,
  648 F.3d 848 (D.C. Cir. 2011) ........................................... 24, 33

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
  549 U.S. 422 (2007) ........................................................... 15

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ........................................................... 22

*Sparrow v. United Air Lines, Inc.*,
  216 F.3d 1111 (D.C. Cir. 2000) ............................................ 15

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ................................................................... 15

*Thomas v. Principi,*
    394 F.3d 970 (D.C. Cir. 2005) .............................................. 15

*\*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ........................................... 24, 27, 31

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,*
    484 U.S. 365 (1988) ................................................................. 17

*United States ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) ......................................................... 25, 34

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ................................................................. 17

*United States v. Mitchell,*
    445 U.S. 535 (1980) ................................................................. 28

*United States v. Mitchell,*
    463 U.S. 206 (1983) ................................................................. 28

*United States v. Sherwood,*
    312 U.S. 584 (1941) ................................................................. 28

*Utility Air Regulatory Grp. v. EPA,*
    573 U.S. 302 (2014) .......................................................... 17, 21

*W. Org. of Res. Councils v. Zinke,*
    892 F.3d 1234 (D.C. Cir. 2018) .............................................. 15

*Yukon-Kuskokwim Health Corp. v. United States,*
    444 F. Supp. 3d 215 (D.D.C. 2020) ...................................... 15

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury,*
    750 F. Supp. 2d 150 (D.D.C. 2010) ...................................... 37

*Zevallos v. Obama,*
    10 F. Supp. 3d 111 (D.D.C. 2014) ............................... 16, 36, 37

*Zevallos v. Obama,*
    793 F.3d 106 (D.C. Cir. 2015) ................................... 16, 39, 43

## **Statutes**

5 U.S.C. § 701(a) ...................................................... 29, 32, 35

5 U.S.C. § 706(2)(A) ................................................................................................. 36

6 U.S.C. § 236 ......................................................................................... 26, 31, 35

8 U.S.C. § 1101(a)(15)(G) ....................................................................................... 28

8 U.S.C. § 1201(i) .................................................................................... 26, 31, 35

8 U.S.C. § 1252 ............................................................................................... 26, 31

22 U.S.C. § 288(d) ................................................................................................ 28

50 U.S.C. § 1701(a) ................................................................................................ 6

50 U.S.C. § 1702(a)(1)(B) ...................................................................................... 7

50 U.S.C. § 1702(c) ............................................................................................ 8, 39

50 U.S.C. § 4305(b)(1) ........................................................................................... 6

50 U.S.C. §§ 1701-1706 ......................................................................................... 1

50 U.S.C. §§ 4301-4341 ......................................................................................... 6

An Act of Sept. 26, 1961,
  Pub. L. No. 87-301, 75 Stat. 650 (1961) ........................................................... 26

Consolidated Appropriations Act, 2008,
  Pub. L. No. 110-161, 121 Stat. 1944 (2007) ..................................................... 19

Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008,
  Pub. L. No. 110-161, 121 Stat. 1944 (2007) ....................................................... 4

Department of State, Foreign Operations, and Related Programs Appropriations Act, 2012,
  Pub. L. No. 112-74, 125 Stat. 786 (2011) ........................................................... 4

Department of State, Foreign Operations, and Related Programs Appropriations Act, 2014,
  Pub. L. No. 113-76, 128 Stat. 5 (2014) ............................................................... 4

Department of State, Foreign Operations, and Related Programs Appropriations Act, 2015,
  Pub. L. No. 113-235, 128 Stat. 2130 (2014) ....................................................... 4

Department of State, Foreign Operations, and Related Programs Appropriations Act, 2017,
  Pub. L. No. 115-31, 131 Stat. 135 (2017). .......................................................... 5

Department of State, Foreign Operations, and Related Programs Appropriations Act, 2018,
  ("Section 7031(c)"),
  Pub. L. No. 115-141, 132 Stat. 348 (2018) ................................................. *passim*

Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and
   Obstruct Terrorism Act of 2001 (USA Patriot Act),
   Pub. L. No. 107-56, 115 Stat. 272 (2001) ............................................................................... 7

**Rules**

Fed. R. Civ. P. 12 ........................................................................................................... 14, 15

Fed. R. Civ. P. 56 ................................................................................................................. 16

**Legislative Materials**

Amending the Immigration and Nationality Act,
   H.R. Rep. No. 87-1086 (1961), *reprinted in* 1961 U.S.C.C.A.N. 2950 .................................. 26

International Emergency Economic Powers Act ("IEEPA"),
   S. Rep. No. 95-466 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4540 ..................................... 6

Trading With the Enemy Act ("TWEA"),
   65th Cong. Ch. 106, 40 Stat. 411 (1917) ................................................................................. 6

**Regulations**

31 C.F.R. pt. 583 .................................................................................................................... 9

31 C.F.R. § 501.807 ....................................................................................................... *passim*

31 C.F.R. § 583.802 ............................................................................................................... 9

**Executive Orders**

Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers,
   Exec. Order No. 12,978,
   60 Fed. Reg. 54,579 (Oct. 21, 1995) ........................................................................................ 7

Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to
   Commit, or Support Terrorism, Exec. Order No. 13,224,
   66 Fed. Reg. 49,079 (Sept. 23, 2001) ...................................................................................... 7

Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters,
   Exec. Order No. 13,382,
   70 Fed. Reg. 38,567 (June 28, 2005) ....................................................................................... 7

Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption,
   Exec. Order No. 13818,
   82 Fed. Reg. 60,839 (Dec. 20, 2017) ................................................................................ *passim*

## **Other Authorities**

Congressional Research Service, *Foreign Officials Publicly Designated by the U.S. Department of State on Corruption or Human Rights Grounds: A Chronology* (May 18, 2020) .................................................................................................................. 21

Congressional Research Service, *Targeting Foreign Corruption and Human Rights Violators in FY2019 Consolidated Appropriations* (June 25, 2019) ...................................... 21

*Proclamation 7750—To Suspend Entry as Immigrants or Nonimmigrants of Persons Engaged In or Benefiting From Corruption* (Jan. 12, 2004). .............................................. 19, 20

The White House, *Fact Sheet: National Strategy to Internationalize Efforts Against Kleptocracy* (Aug. 10, 2006) .................................................................................................. 20

U.S. Dep't of State, *Combating Corruption and Promoting Good Governance* ..................... 5, 21

U.S. Dep't of State, *Corruption-Related Designations – Bureau of International Narcotics and Law Enforcement Affairs* ........................................................................ 5, 20, 22

U.S. Dep't of State, *Report to Congress on Anti-Kleptocracy and Human Rights Visa Restrictions – Bureau of International Narcotics and Law Enforcement Affairs* ......... 5, 20

U.S. Dep't of State, *Public Designation of Five Bulgarian Public Officials Due to Involvement in Significant Corruption* (June 2, 2021) .................................................. 9, 10, 31

## INTRODUCTION

The United States Government utilizes an array of tools to combat corruption abroad that threatens this country's national security and foreign policy.  One of those tools is the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, which confers upon the President broad authority to declare a national emergency and initiate economic sanctions that impact the national security, foreign policy, and economy of the United States.  Invoking this statute, the President issued Executive Order No. 13818 ("E.O. 13818" or "Executive Order"), "Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption."  In tandem with the Executive's authority under E.O. 13818, Congress authorized the Department of State to identify certain corrupt foreign government officials and their family members and deny them access to the United States pursuant to Section 7031(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act.

In June 2021, the Department of the Treasury and the Department of State employed these authorities against Plaintiff Delyan Slavchev Peevski ("Peevski" or "Plaintiff").  Pursuant to E.O. 13818, the Office of Foreign Assets Control ("OFAC") designated Plaintiff for being a foreign government official responsible for or complicit in, or who has directly or indirectly engaged in corruption.  As a result, the Government blocked Plaintiff's property and interests in property within the jurisdiction of the United States and added him to the list of Specially Designated Nationals and Blocked Persons, along with six of his companies (collectively, "Plaintiffs").  In addition, the Secretary of State identified Plaintiff as a corrupt government official under Section 7031(c) for regularly engaging in significant corruption as a Bulgarian member of parliament and, as a consequence, denied him and some of his family members access to this country.

Plaintiffs raise three equally meritless claims against the Department of State defendants ("State").  First, Plaintiffs argue that State violated the Administrative Procedure Act ("APA") because Section 7031(c) only allows for the identification of current government officials, not former government officials, like Peevski.  But Congress was silent about whether the term "officials" encompassed current, former, or both current and former government personnel, and the Court should defer to State's reasonable interpretation that the term covers both current and former officials.  Second, citing the same overly narrow definition of officials, Plaintiffs contend that the Section 7031(c) determination is an ultra vires action; this claim fails for the same reason that their APA claim lacks merit.  Third, Plaintiffs wrongly assert that they may challenge the Secretary of State's Section 7031(c) determination.  Long-standing Supreme Court precedent, grounded in separation-of-powers principles, confirms that the district courts should not second-guess the decisions of the Executive regarding who may and may not enter this country, especially given the lack of express congressional authorization to conduct such a review.  Further, the APA does not afford Plaintiffs a right to challenge a final agency action when, as here, another statute precludes judicial review, and the decision is left to the agency's discretion.  Just last year, another member of this Court reached the same conclusions when considering an identical challenge to a Section 7031(c) determination under the APA.

Plaintiffs also put forth two unavailing claims pertaining to the Department of the Treasury defendants ("Treasury").  First, they allege that OFAC's designation lacks adequate factual information, in violation of the APA.  But the administrative record amply supports the agency's conclusion that Peevski engaged in corruption as a Bulgarian government official.  Second, despite filing a reconsideration petition in February 2022, and receiving a decision in December 2022, Plaintiffs say they have not been afforded a meaningful opportunity to petition OFAC to reconsider

their designations.  Quite the contrary, Plaintiffs sought administrative reconsideration of their designations based on the available unclassified information.  And after considering the specific arguments raised by Plaintiffs and evaluating all available evidence, OFAC denied Plaintiffs' petition for reconsideration in December 2022.  Should Plaintiffs choose to do so, they may seek administrative reconsideration again to present any and all relevant information to OFAC about the propriety of their designations.

For these reasons, as discussed more fully below, the Court should grant Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment.

## **BACKGROUND**

I.   **Section 7031(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2018 (Div. K, Pub. L. No 115-141)**

Section 7031(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2018 (Pub. L. No. 115-141, div. K., tit. VII, § 7031(c), 132 Stat. 348, 884-85) (2018) ("Section 7031(c)") provides that officials of foreign governments and their immediate family members who the Secretary of State ("Secretary") has credible information have been involved in significant corruption or a gross violation of human rights are ineligible for entry into the United States.  *See* Section 7031(c)(1)(A).  It also requires that the Secretary publicly or privately designate or identify the officials and immediate family members without regard to whether the individual has applied for a visa.  *See* Section 7031(c)(1)(B).  An individual designated under Section 7031(c)(1)(B) is generally ineligible for entry into the United States; in other words, the individual is ineligible for a visa and for admission to the United States.  The statute allows for exceptions and waivers: (1) Section 7031(c)(2) provides that individuals shall not be ineligible if entry into the United States would further important United States law enforcement objectives or if the travel is necessary for the United States to comply with the U.N. Headquarters Agreement,

and (2) Section 7031(c)(3) provides that the Secretary may waive ineligibility if the Secretary determines that the waiver would serve a compelling national interest or that the circumstances which caused the individual to be ineligible have changed sufficiently.

Congress first authorized Section 7031(c) in Section 699L of the Fiscal Year ("FY") 2008 annual appropriations act, requiring the Secretary to "compile and maintain a list of officials of foreign governments and their immediate family members who the Secretary determines there is credible evidence to believe have been involved in corruption relating to the extraction of natural resources in their countries."  Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008, Pub. L. No. 110-161, div. J, tit. VI, § 699L, 121 Stat. 1844, 2373-74 (2007).  A version of this provision has been passed in every annual appropriations act for the Department of State since then, with substantive changes made in the following years:

- **FY2012.**  Expanded to include "significant corruption" and changed "credible evidence" to "credible information."  Department of State, Foreign Operations, and Related Programs Appropriations Act, 2012, Pub. L. No. 112-74, div. I, tit. VII, § 7031(c), 125 Stat. 786, 1211-12 (2011).

- **FY2014.**  Expanded further to include involvement in "a gross violation of human rights" and added a provision for public posting of the report.  Department of State, Foreign Operations, and Related Programs Appropriations Act, 2014, Pub. L. No. 113-76, div. K, tit. VII, § 7031(c), 128 Stat. 5, 511-12 (2014).

- **FY2015.**  Added subsection 1(B), permitting private or public designation or identification without regard to visa status.  Department of State, Foreign Operations, and Related Programs Appropriations Act, 2015, Pub. L. No. 113-235, div. J, tit. VII, § 7031(c), 128 Stat. 2130, 2620-21 (2014).

4

·   **FY2017.**  Subsection 1(B) made mandatory ("may" became "shall").  Department of State, Foreign Operations, and Related Programs Appropriations Act, 2017, Pub. L. No. 115-31, div. J, tit. VII, § 7031(c), 131 Stat. 135, 640-41 (2017).

The Department of State implements Section 7031(c) as part of its multifaceted approach to combatting corruption.  *See* U.S. Dep't of State, *Corruption-Related Designations – Bureau of International Narcotics and Law Enforcement Affairs*, https://www.state.gov/corruption-related-designations-bureau-of-international-narcotics-and-law-enforcement-affairs-2/ (last visited Feb. 27, 2023).  Section 7031(c) reinforces U.S. efforts to fight corruption globally, which directly impacts the foreign policy, economic, and national security interests of the United States and those of partner nations.  *See* U.S. Dep't of State, *Combating Corruption and Promoting Good Governance*, https://www.state.gov/combating-corruption-and-promoting-good-governance/ (last visited Feb. 27, 2023).

Globally, more than 300 officials and their family members have been publicly designated under Section 7031(c) for involvement in significant corruption or a gross violation of human rights.  *See* U.S. Dep't of State, *Corruption-Related Designations – Bureau of International Narcotics and Law Enforcement Affairs*.  The Department of State posted on its website the unclassified portions of the most recent reports to Congress regarding implementation of Section 7031(c).  *See* U.S. Dep't of State, *Report to Congress on Anti-Kleptocracy and Human Rights Visa Restrictions – Bureau of International Narcotics and Law Enforcement Affairs*, https://www.state.gov/reports/report-to-congress-on-anti-kleptocracy-and-human-rights-visa-restrictions-public-listing/ (last visited Feb. 27, 2023).

## II.      The International Emergency Economic Powers Act

For nearly its entire history, the United States has utilized economic sanctions as a critical means to protect national security and achieve foreign policy goals.  During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917.  *See* 65th Cong. Ch. 106, 40 Stat. 411, 411-16 (1917) (codified as amended at 50 U.S.C. §§ 4301-4341).  As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  *See* 50 U.S.C. § 4305(b)(1); *see also Dames & Moore v. Regan*, 453 U.S. 654, 670, 672 (1981).  Although TWEA does not use the term "block," the authority it conveys to the Executive Branch to regulate, prevent, or prohibit transactions consistently has been interpreted to encompass the power to block or freeze an entity's property.  *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).  In 1977, Congress amended TWEA and enacted the International Emergency Economic Powers Act ("IEEPA").  *See* S. Rep. No. 95-466, at 1-2 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4540, 4541.  IEEPA limited TWEA's application to periods of declared wars, but also extended the President's authority to declare national emergencies.  *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984).  Although the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA authorizes the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," *see* 50 U.S.C. § 1701(a).  Once such a national emergency is declared, IEEPA authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with

respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).

Pursuant to this expansive authority, and in response to a variety of declared national emergencies, presidents have imposed sanctions with respect to many countries, including Iran, Burma, and North Korea, as well as on individuals, such as narcotics traffickers, proliferators of weapons of mass destruction, and terrorists and their supporters. *See, e.g.*, Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers, Exec. Order No. 12,978, 60 Fed. Reg. 54,579 (Oct. 21, 1995) (blocking assets of persons who "play a significant role in international narcotics trafficking centered in Colombia"); Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters, Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005) (blocking assets of persons who have engaged in transactions that have materially contributed to the proliferation of weapons of mass destruction and their supporters); Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) (blocking assets of persons determined "to have committed, or to pose a significant risk of committing, acts of terrorism that threaten" U.S. national security).

In October 2001, Congress amended IEEPA through passage of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA Patriot Act), Pub. L. No. 107-56, 115 Stat. 272 (2001). Among other things, those amendments provided that, in case of judicial review of an IEEPA-based blocking designation, an agency record containing classified information "may be submitted to the

reviewing court *ex parte* and *in camera*." *See* 50 U.S.C. § 1702(c), added by USA Patriot Act § 106, 115Stat. at 278.

## III.   Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption

In accordance with IEEPA, the President issued E.O. 13818 on December 20, 2017, "Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption." Exec. Order No. 13818, 82 Fed. Reg. 60,839 (Dec. 20, 2017). In doing so, the President determined that "the prevalence and severity of human rights abuse and corruption that have their source, in whole or in substantial part, outside the United States . . . have reached such scope and gravity that they threaten the stability of international political and economic systems." *Id.* The President went on to explain that "[t]he United States seeks to impose tangible and significant consequences on those who commit serious human rights abuse or engage in corruption, as well as to protect the financial system of the United States from abuse by these same persons." *Id.* As a consequence, the President declared a national emergency to counter the articulated threat, blocking the property and interests in property of:

> (ii)  any foreign person determined by the Secretary of the Treasury, in consultation with the Secretary of State and Attorney General:
> . . .
>
> (B) to be a current or former government official, or a person acting for or on behalf of such an official, who is responsible for or complicit in, or has directly or indirectly engaged in:
>
> (1) corruption, including the misappropriation of state assets, the expropriation of private assets for personal gain, corruption related to government contracts or the extraction of natural resources, or bribery.

*Id.* § 1(a)(ii)(B)(1).

The Executive Order further authorizes the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including adopting rules and regulations, and to

employ all powers granted to me by IEEPA . . . as may be necessary to implement this order," and to re-delegate such functions as needed.  E.O. 13818, § 8.  Subsequently, the Secretary of the Treasury delegated to the Director of OFAC the authority to block persons under the Executive Order.[1]  *See* 31 C.F.R. § 583.802.

A person blocked pursuant to the Executive Order, as well as any other OFAC authority, "may seek administrative reconsideration of his, her or its designation . . . , or assert that the circumstances resulting in the designation no longer apply, and thus seek to have the designation rescinded."  31 C.F.R. § 501.807.  The blocked person "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation."  *Id.* § 501.807(a).  In addition, the blocked person may propose "remedial steps . . . which the person believes would negate the basis for designation."  *Id.*  Upon review of the submitted information, OFAC could "request clarifying, corroborating, or other additional information."  *Id.* § 501.807(b).  OFAC provides "a written decision to the blocked person" after completing its assessment of the merits of the petition for reconsideration.  *Id.* § 501.807(d).

## STATEMENT OF FACTS

### I.    The Secretary of State's Section 7031(c) Determination Regarding Peevski

On June 2, 2021, State announced the public designation of Peevski and some of his immediate family members, among others, pursuant to Section 7031(c).[2]  *See* U.S. Dep't of State, *Public Designation of Five Bulgarian Public Officials Due to Involvement in Significant Corruption* (June 2, 2021), https://www.state.gov/public-designation-of-five-bulgarian-public-

---

[1]  Pursuant to the delegation of authority, OFAC promulgated regulations to implement E.O. 13818.  *See* 31 C.F.R. pt. 583.

[2]  Peevski's immediate family members are not parties to this lawsuit.  *See generally* Am. Compl. ¶¶ 17-29, ECF No. 28.

officials-due-to-involvement-in-significant-corruption/.  The agency designated Plaintiff and four other Bulgarian public officials for their involvement in significant corruption in Bulgaria.  *Id.*  In particular, Plaintiff, as a member of the Bulgarian parliament, used an official in the National Bureau for Control on Special Intelligence-Gathering Devices as "an intermediary and accomplice to peddle influence and pay bribes to protect himself from public scrutiny and to exert influence over key institutions and sectors in Bulgarian society."  *Id.*  State explained that the designation rendered Plaintiff and some of his immediate family members ineligible for entry into the United States.  *Id.*  Further, State noted that its Section 7031(c) determination reaffirmed the agency's "commitment to supporting rule of law and strengthening democratic institutions in Bulgaria."  *Id.*

## II.     OFAC's Designation of Plaintiffs Pursuant to Executive Order 13818

Also on June 2, 2021, OFAC blocked Plaintiffs' property and interests in property pursuant to E.O. 13818.  *See* Certified Administrative Record ("AR") 1-8, 9-23.  In particular, OFAC designated Peevski for being a current or former government official who is responsible for or complicit in, or who has directly or indirectly engaged in, corruption.  A.R. 1, 10.  OFAC also designated six entities for being owned or controlled by Peevski or one of his companies.  A.R. 2-8, 11-23; *see* E.O. 13818 § 1(a)(iii)(B) (allowing for designation of entities owned or controlled by designated persons).

In the corresponding press release, OFAC described Peevski as an oligarch who previously served as a Bulgarian member of parliament who "regularly engaged in corruption, using influence peddling and bribes to protect himself from public scrutiny and exert control over key institutions and sectors in Bulgarian society."  A.R. 26.  Indeed, Peevski engaged in corruption through his front man llko Dimitrov Zhelyazkov ("Zhelyazkov"), the former Deputy Chief of the Bulgarian State Agency for Technical Operations and former Bulgarian State Agency for National Security

("DANS") officer who was appointed to the National Bureau for Control on Special Intelligence-Gathering Devices. *Id.* Through Zhelyazkov, Peevski conducted a bribery scheme involving Bulgarian residency documents for foreign persons, as well as bribed government officials through various means in exchange for their information and loyalty. A.R. 26-27. In particular, Zhelyazkov offered bribes to senior Bulgarian government officials who, in return, were expected to provide information to Zhelyazkov for onward passage to Peevski. A.R. 27. Zhelyazkov placed individuals who accepted his offers in positions of authority and provided them a monthly bribe. *Id.* Further, Peevski and Zhelyazkov had an official placed in a leadership position to embezzle funds for them in 2019. *Id.* As of early 2018, Peevski and Zhelyazkov also ran a scheme to sell Bulgarian residency documents; company representatives purportedly paid bribes to Bulgarian officials to ensure their clients received citizenship documents immediately rather than making the $500,000 deposit or waiting the five years for a legitimate request to be processed. *Id.*

## III.   Plaintiffs' Petition for Reconsideration of OFAC's Designations

On February 8, 2022, Plaintiffs submitted a petition for reconsideration pursuant to 31 C.F.R. § 501.807, arguing that OFAC had an insufficient basis to designate them under E.O. 13818. *See* OFAC Denial Letter, Ex. 1 (dated Dec. 5, 2022, sent from OFAC to Plaintiffs' counsel). Specifically, Plaintiffs argued:

- ·   The allegations articulated in OFAC's press release accompanying Peevski's designation are too general to refute;

- ·   The allegations are based on rumors, innuendo, and speculation generated primarily by Peevski's political opponents;

- ·   Peevski does not have a financial or business relationship with Ilko Zhelyazkov;

- ·   The findings from the Bulgarian Specialized Prosecutor Office's investigation into Peevski exonerate him from corruption allegations;

11

· Peevski did not have any involvement in the so-called  "Golden Passport" scheme, an apparent reference to Peevski and Zhelyazkov's scheme to sell Bulgarian residency documents; and

· Peevski did not engage in influencing local elections.

*Id.* at 2-5.  Peevski declined to make any arguments regarding the designations of the six entities he owns or controls.  *Id.* at 6.

OFAC assessed the merits of all of Plaintiffs' arguments and denied his petition for reconsideration on December 2, 2022 (just over four months after this lawsuit was filed).  *See* OFAC Denial Letter.  The Government reiterated that it had ample evidence to support Plaintiffs' designation—as articulated in the accompanying press release—and maintained confidence in the veracity of the information, including the scheme to sell Bulgarian residency documents.  *Id.* at 2. OFAC went on to rebut Peevski's allegation that he did not have any financial or business relationship with Zhelyazkov, noting that it had identified additional reporting that corroborates the financial and business relationship between Peevski and Zhelyazkov.  *Id.* at 2-3.  Further, OFAC refuted Plaintiffs' contention that the investigation conducted by the Bulgarian Specialized Prosecutor's Office exonerated Peevski of any wrongdoing.  *Id.* at 2-4.  OFAC explained, among other things, that the Specialized Prosecutor's Office acknowledged the significant differences between OFAC sanctions and Bulgarian criminal law, as well as the fact that the Specialized Prosecutor's Office only assessed whether Peevski committed a crime in Bulgaria, not whether OFAC had a sufficient basis to effectuate the designation.  *Id.* at 2-4.

## IV.    Litigation Procedural History

On August 6, 2022, Plaintiffs initiated the instant litigation with the submission of their complaint.  *See* Compl., ECF No. 1.  In the initial complaint, Plaintiffs raised two claims: (1) State's Section 7031(c) determination and OFAC's designation pursuant to E.O. 13818 were

arbitrary and capricious violating the APA; and (2) OFAC's failure to reach a determination with regard to Plaintiffs' pending petition for reconsideration violated the APA. *Id.* ¶¶ 51-65. The Government filed a partial answer to the Complaint on October 28, 2022, as the case pertained to Treasury. *See* Defs.' Partial Answer, ECF No. 20.

As to the claims against State, the Government partially moved to dismiss the Complaint. *See* Defs' Partial Mot. to Dismiss, ECF No. 19. Defendants argued that long-standing Supreme Court precedent, grounded in separation of-powers principles, precluded the district courts from second-guessing the decisions of the Executive regarding who may and may not enter this country, especially given the lack of express congressional authorization to conduct such a review. *Id.* at 7-12. Defendants also argued that the APA does not afford Plaintiff a right to challenge a final agency action when, as here, another statute precludes judicial review, and the decision is left to the agency's discretion. *Id.* at 12-17.

After the Court granted Plaintiffs' unopposed extension of time, Plaintiffs responded to the Defendants' partial motion to dismiss on November 28, 2022. *See* Pls.' Opp'n to Defs.' Partial Mot. to Dismiss, ECF No. 23. Although not alleged in the Complaint, Plaintiffs primarily argued that State's 7031(c) determination violated the APA because Peevski was a former government official at the time of the Secretary's determination, not a current government official. *Id.* at 6-12; *see also Id.* at 6 n.3 (acknowledging that the claim was not alleged in the Complaint). Plaintiff also argued that the doctrine of consular non-reviewability did not preclude the Court from assessing the propriety of State's Section 7031(c) determination. *Id.* at 13-19.

Before State could file a reply memorandum in support of their partial motion to dismiss, Plaintiff sought leave from the Court to amend their complaint, to which Defendants consented, and the Court then granted. *See* Pls.' Mot. to File Am. Compl., ECF No. 26; January 11, 2023

Minute Order.  First, Plaintiffs allege in the amended complaint that State's Section 7031(c) determination violated the APA because the provision only provides for the designation of current government officials, not former government officials, like Peevski.  *See* Am. Compl. ¶¶ 56-62, ECF No. 28.  Second, Plaintiffs contend that State's Section 7031(c) determination constituted an *ultra vires* action based on the same narrow interpretation of Section 7031(c).  *Id.* ¶¶ 63-66.  Third, Plaintiffs assert that State's Section 7031(c) determination and OFAC's designation pursuant to E.O. 13818 were based on insufficient factual evidence and were therefore arbitrary and capricious, in violation of the APA.  *Id.* ¶¶ 67-71.  Fourth, Plaintiffs argue that OFAC failed to provide them sufficient information about the basis for Peevski's designation, thus not affording them a meaningful opportunity to petition for reconsideration.  *Id.* ¶¶ 72-79.  Though Plaintiffs filed the Amended Complaint only weeks after receiving OFAC's denial of their reconsideration petition, Plaintiffs did not raise any claims about the December 2022 denial.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move to dismiss a complaint, or any portion thereof, for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  The party claiming subject-matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (internal citation omitted).  When evaluating a Rule 12(b)(1) motion to dismiss, the district court "assume[s] the truth of all material factual allegations in the complaint and 'construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged[.]'"  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir.

2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)); *accord Mattwaoshshe v. United States*, 557 F. Supp. 3d 28, 34 (D.D.C. 2021).  The Court must dismiss any claim over which it lacks subject matter jurisdiction.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506-07 (2006); *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction)[.]") (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998)).

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to be sufficient "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted); *accord Yukon-Kuskokwim Health Corp. v. United States*, 444 F. Supp. 3d 215, 218 (D.D.C. 2020).  The district court "must treat the complaint's factual allegations as true, and must grant [Plaintiff] the benefit of all inferences that can be derived from the facts alleged." *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1240-41 (D.C. Cir. 2018) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)).  However, Plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that the district court does not need to accept as true legal conclusions set forth in the Complaint).  For purposes of a Rule 12(b)(6) motion, the "complaint" also includes matters incorporated therein.  *See, e.g.*, *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) ("Matters that are not 'outside' the pleadings a court may consider on a motion to dismiss include 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint,' or documents 'upon which the plaintiff's complaint necessarily relies' even if the

document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.") (citation omitted).

Federal Rule of Civil Procedure Rule 12(d) authorizes the court to treat a Rule 12(b)(6) motion as a motion for summary judgment where the defendants rely on matters outside the pleadings, provided that all parties have a reasonable opportunity to present all material pertinent to the motion.  Fed. R. Civ. P. 12(d); Fed. R. Civ. P. 56; *see Conant v. Wells Fargo Bank, N.A.*, 60 F. Supp. 3d 99, 106-07 (D.D.C. 2014).   Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Conant*, 60 F. Supp. 3d at 107.  In the context of an APA claim, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."[3]  *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012)).

## ARGUMENT

### I.     State's Interpretation of Section 7031(c) did not Violate the APA (Count I)

Plaintiffs allege that State's determination that Peevski engaged in significant corruption during his tenure as a member of the Bulgarian parliament was not in accordance with law because Section 7031(c) only applies to current, not former, government officials.  Am. Compl.  ¶ 59. When determining that Peevski met the criteria for designation under Section 7031(c), State

---

[3]  Because Defendants are moving to dismiss the instant lawsuit pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) and, alternatively, for summary judgement pursuant to Federal Rule of Civil Procedure 56, the Government has not filed an answer to the Amended Complaint.

permissibly interpreted Section 7031(c) as applying to current and former government officials, and the Court should defer to State's interpretation.

### A.     *Chevron* Deference

When a Court is reviewing an agency's "construction of the statute which it administers, it is confronted with two questions." *Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).   "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter.'"  *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. at 842-43)).   However, "'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'"  *Id.* (quoting *Chevron*, 476 U.S. at 843).   The overall statutory scheme may render a seemingly ambiguous statutory term capable of only one reasonable interpretation to ensure "a substantive effect that is compatible with the rest of the law."  *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)).

The courts have routinely shown *Chevron* deference to agency interpretations in conjunction with informal agency adjudications, where such interpretations "have general applicability and the force of law."  *Fox v. Clinton*, 684 F.3d 67, 78 (D.C. Cir. 2012); *see also United States v. Mead Corp.*, 533 U.S. 218, 230 (2001) (observing that *Chevron* deference extends beyond agency interpretations rendered through notice-and-comment rulemaking or formal adjudication).   When assessing whether *Chevron* deference is owed, the D.C. Circuit considers: (1) the "interstitial nature" of the legal question; (2) the related expertise of the government agency; (3) the importance of the question to administration of the statute; (4) the complexity of that

administration, and; (5) the careful consideration the government agency has given the question over a long period of time.  *Fox*, 684 F.3d at 77 (quoting *Barnhart v. Walton,* 535 U.S. 212, 221 (2002)).

### B.      The Secretary's Section 7031(c) Determination Qualifies for *Chevron* Deference

State fully satisfies the threshold requirements.  *See id.*  First, the legal question is interstitial in nature because Congress did not define the scope of the term "official" in 7031(c), leaving the question subject to interpretation.  Indeed, Section 7031(c) provides that "officials" of foreign governments and their immediate family members who the Secretary has credible information have been involved in significant corruption or a gross violation of human rights are ineligible for entry into the United States.  *See* Section 7031(c)(1)(A).  Section 7031(c), however, does not define or describe who should be considered "officials" of foreign governments, notwithstanding the central nature of this term to the administration of the statute.  *Id.*  Second, State has ample expertise to consider whether former officials should be considered within the scope of the operative term—Congress has afforded State with the responsibility of making the complex determinations regarding how and when to identify individuals under Section 7031(c).  The Secretary's determination regarding whether there is credible information of involvement in significant corruption or a gross violation of human rights are highly nuanced foreign policy determinations, squarely within State's primary skillset.  And finally, as described more fully below, State has long taken the position that former officials may permissibly fall within the scope of Section 7031(c).  Accordingly, the final factor also favors deference.

### C.      Section 7031(c) is Silent about the Scope of the Term "Officials"

Plaintiffs urge an overly narrow interpretation of the term "officials" of foreign governments though Section 7031(c) is silent about whether it applies to current officials, former

officials, or both current and former officials. *See* Am. Compl. ¶¶ 56-62. Section 7031(c) provides that "officials" of foreign governments and their immediate family members who the Secretary has credible information have been involved in significant corruption or a gross violation of human rights are ineligible for entry into the United States. *See* Section 7031(c)(1)(A). Section 7031(c), however, does not modify "officials" of foreign governments. *Id.* Because Section 7031(c) "is silent or ambiguous with respect to" whether it applies equally to both current and former officials, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *City of Arlington*, 569 U.S. at 296; *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (concluding that the term "employees" in Title VII was ambiguous about whether it applied to current or former employees because there was "no temporal qualifier . . . such as would make plain that [provision] protects only persons still employed at the time of the retaliation").

**D.      The Court Should Defer to State's Permissible Interpretation of the Term "Officials" in Section 7031(c)**

The Congressional adoption of 7031(c) in 2007 supports the broad interpretation of the term "officials" adopted by State. *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. J, tit. VI, § 699L, 121 Stat. 1844, 2373-74 (2007). When Congress first authorized Section 7031(c) in Section 699L of the Fiscal Year FY 2008 annual appropriations act, it expressly stated that the new authority was meant to further "the National Strategy to Internationalize Efforts Against Kleptocracy and Presidential Proclamation 7750[.]" *Id.* Proclamation 7750 explicitly acknowledged "the serious negative effects that corruption of public institutions has on the United States efforts to promote security[.]" *Proclamation 7750—To Suspend Entry as Immigrants or Nonimmigrants of Persons Engaged In or Benefiting From Corruption* (Jan. 12, 2004), https://www.govinfo.gov/content/pkg/WCPD-2004-01-19/pdf/WCPD-2004-01-19-Pg61-2.pdf.

In doing so, the President explicitly suspended the immigrant or nonimmigrant entry into the United States of certain public officials or former public officials engaged in corruption. *Id.* § 1; *see also* The White House, *Fact Sheet: National Strategy to Internationalize Efforts Against Kleptocracy* (Aug. 10, 2006), https://georgewbush-whitehouse.archives.gov/news/releases/2006/08/20060810-1.html ("We will work closely with international partners to identify kleptocrats and those who corrupt them, and deny such persons entry and safe haven."). To further the goals articulated in Proclamation 7750, therefore, State likewise applies Section 7031(c) to current and former government officials. *See* U.S. Dep't of State, *Corruption-Related Designations – Bureau of International Narcotics and Law Enforcement Affairs*, https://www.state.gov/corruption-related-designations-bureau-of-international-narcotics-and-law-enforcement-affairs-2/ (identifying Proclamation 7750 and Section 7031(c) "as part of a multifaceted approach to combatting corruption globally").

Section 7031(c) reporting by State to Congress also reflects the agency's longstanding interpretation of the term "officials" to encompass both current and former government actors. *See* Section 7031(c)(4) ("[T]he Secretary of State shall submit a report, including a classified annex if necessary, to [Congress] describing the information related to corruption or violation of human rights concerning each of the individuals found ineligible in the previous 12 months[.]"). State must report to Congress—as required by Section 7031(c)(4)—the details of its Section 7031(c) designations, including whether the individuals are current or former government officials. *See* U.S. Dep't of State, Report to Congress on Anti-Kleptocracy and Human Rights Visa Restrictions – Bureau of International Narcotics and Law Enforcement Affairs, https://www.state.gov/reports/report-to-congress-on-anti-kleptocracy-and-human-rights-visa-restrictions-public-listing/ (last visited Feb. 27, 2023). Despite such notice, Congress has updated

20

Section 7031(c) on several occasions since the statute's passage yet has never found it necessary to expressly narrow the provision to only current officials.[4]  *See Barnhart*, 535 U.S. at 220 (observing "Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible" given that it amended the statute numerous times without changing the operative term).

Finally, restricting the term "officials" to reach only current government actors is not compatible with the text and purpose of Section 7031(c).  *See Utility Air Regulatory Grp.*, 573 U.S. at 321.  First, often evidence of significant corruption becomes known to State after the individual has left public office; allowing former corrupt officials to enter the United States notwithstanding their past malfeasance would frustrate State's intent to send a message to the world that there are consequences to engaging in corruption abroad.  *See* U.S. Dep't of State, *Combating Corruption and Promoting Good Governance*, https://www.state.gov/combating-corruption-and-promoting-good-governance/ ("Denying corrupt individuals access to the United States and global financial systems sends a strong message about our values, and it demonstrates in meaningful ways that there are consequences for those who engage in corruption.").  Second, if Plaintiff's interpretation were correct, current officials could merely resign from their formal government positions, while continuing to exert influence and propagate the same corrupt

---

[4]  Recent products from the Congressional Research Service acknowledge that Congress received the mandated reports about recent Section 7031(c) identifications of former government officials. *See, e.g.*, Congressional Research Service, Targeting Foreign Corruption and Human Rights Violators in FY2019 Consolidated Appropriations (June 25, 2019, https://crsreports.congress.gov/product/pdf/IF/IF10905/5 (acknowledging identifications of the former president of the Gambia and a former supreme court magistrate from Guatemala); Congressional Research Service, Foreign Officials Publicly Designated by the U.S. Department of State on Corruption or Human Rights Grounds: A Chronology (May 18, 2020), https://crsreports.congress.gov/product/pdf/R/R46362 (noting, inter alia, identifications of a former Mexican governor and former military personnel from El Salvador).

activities without Section 7031(c) ramifications.  *See* U.S. Dep't of State, *Corruption-Related Designations – Bureau of International Narcotics and Law Enforcement Affairs*, https://www.state.gov/corruption-related-designations-bureau-of-international-narcotics-and-law-enforcement-affairs-2/ ("Designations expose corrupt actors through media attention, support local law enforcement actions, promote accountability, and highlight the need for anticorruption legal reforms.").  Such a result would undermine the Section 7031(c)'s purpose of "combatting corruption globally."  *Id.*

    *Robinson v. Shell Oil Co.* is instructive*.  See* 519 U.S. 337.  In *Robinson*, the Supreme Court assessed whether the term "employees" in Section 704(a) of Title VII applied equally to current and former employees for purposes of an anti-retaliation lawsuit brought by a terminated employee.  *Id.* at 339.  First, the Supreme Court concluded that the term "employees" was ambiguous because, like the instant case, the term did not contain a "temporal qualifier  . . . such as would make plain that § 704(a) protects only persons still employed at the time of the retaliation."  *Id.* at 341. In doing so, the Supreme Court observed "[t]hat the statute could have expressly included the phrase 'former employees' does not aid our inquiry.  Congress also could have used the phrase 'current employees.'"  *Id.*  Second, the Supreme Court determined that it was "more consistent with the broader context of Title VII and the primary purpose of § 704(a)" that former employees "are included within § 704(a)'s coverage."  *Id.* at 346.  To hold otherwise, the Supreme Court reasoned, "would provide a perverse incentive for employers to fire employees who might bring Title VII claims."  *Id.*

    For these reasons, the Court should defer to State's permissible interpretation of "officials" in Section 7031(c).  At the very least, State's interpretation of this term is persuasive pursuant to *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944).

## II.     Non-Statutory (Ultra Vires) Review is Not Appropriate (Count II)

Plaintiffs' ultra vires claim fares no better.  *See* Am. Compl. ¶¶ 46-47.  Ultra vires claims are limited to "extreme agency error where the agency has stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court[.]"  *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (quotations omitted).  A litigant may successfully raise an ultra vires claim only when: "'(i) there is no express statutory preclusion of all judicial review; (ii) 'there is no alternative procedure for review of the statutory claim'; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory[.]'"  *Id.* at 763 (D.C. Cir. 2022) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

Based on their exceedingly narrow interpretation of Section 7031(c), Plaintiffs  invite the Court to invoke the doctrine of non-statutory review.  *See* Am. Compl. ¶¶ 46-47.  Plaintiffs, however, have an alterantive mechanism to challenge State's allegedly improper interpretation of Section 7031(c)—the APA, which Plaintiffs expressly embrace in their first claim.  *Id.* ¶¶ 56-62; *see Fed. Express Corp.*, 39 F.4th at 763 (concluding that non-statutory review was appropriate because the plaintiff was "unable to bring a traditional [APA] challenge").  Accordingly, Plaintiffs have "an alternative procedure for review of their statutory claim[.]"  *Fed. Express Corp.*, 39 F.4th at 763.  In any event, the exhaustive discussion above establishes that State did not act "so plainly beyond the bounds" of its statutory authority.  *Id.* at 764.  Indeed, State reasonably interpreted Section 7031(c) to encompass both current and former government officials when reaching its determination with regard to Peevski and repeatedly reported its actions based on this reasonable interpretation to Congress.  *See* Section I, *supra*.

### III.     Peevski's Challenge to the Propriety of the Secretary's Section 7031(c) Determination is not Justiciable (Count III)

Plaintiffs wrongly argue that State's 7031(c) determination was based on insufficient information and was therefore arbitrary and capricious in violation of the APA. *See* Am. Compl. ¶¶ 67-71. But the propriety of the Secretary's 7031(c) determination is a non-justiciable question, as another member of this Court has concluded. Indeed, a fundamental separation-of-powers principle renders the political branches' decisions to exclude noncitizens abroad judicially unreviewable.[5] This principle bars any review of Plaintiffs' challenge to the Section 7031(c) determination, and thus, Count III, as it pertains to State, necessarily fails.

"For more than a century," the Supreme Court has consistently held that separation-of-powers principles firmly commit to Congress and the Executive "the admission and exclusion of foreign nationals." *Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018), *remanded*, 898 F.3d 1266 (9th Cir. 2018), (citing *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). The Supreme Court "ha[s] long recognized the power to . . . exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792; *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("For reasons long recognized as valid, the

---

[5]   This Court has observed that "not every justiciability concern is one of subject matter jurisdiction." *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 331 n.9 (D.D.C. 2016), *aff'd*, 851 F.3d 1 (D.C. Cir. 2017); *Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 294 n.2 (D.D.C. 2018) (same). The D.C. Circuit explained that "certain justiciability questions are governed by Rule 12(b)(6), rather than Rule 12(b)(1)[.]" *Matthew A. Goldstein, PLLC*, 153 F. Supp. 3d at 331 n.9 (citing *Sierra Club v. Jackson*, 648 F.3d 848, 853 (D.C. Cir. 2011)). But the D.C. Circuit also acknowledged that it "ha[s] not always been consistent in maintaining the distinction between a claim that is not justiciable . . . and a claim over which the court lacks subject matter jurisdiction." *Id.* (quoting *Sierra Club*, 648 F.3d at 853). Regardless of whether the Court considers Rule 12(b)(1) or Rule 12(b)(6) to be the appropriate Federal Rule of Civil Procedure to invoke, the Court should dismiss the claims on this basis.

responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."). "The conditions of entry for every alien, . . . the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based[]" are "wholly outside the power of this Court to control." *Fiallo*, 430 U.S. at 796 (internal citation omitted); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven [in] . . . the conduct of foreign relations, the war power, and the maintenance of a republican form of government.  Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."); *Kerry v. Din*, 576 U.S 86, 97 (2015) ("[T]his Court has consistently recognized that these [immigration decisions] are 'policy questions entrusted exclusively to the political branches of our Government, and we have no judicial authority to substitute our political judgment for that of the Congress.'") (quoting *Fiallo*, 430 U.S. at 798).  The "plenary congressional power to make policies and rules for exclusion of aliens has long been firmly established," and "Congress has delegated [the] conditional exercise of this power to the Executive." *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972).  "[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).  Absent such affirmative congressional authorization, judicial review of a noncitizen's exclusion is unavailable.

## A.      Congress Has Expressly Foreclosed Judicial Review of Section 7031(c) Determinations

Far from authorizing judicial review, Congress has precluded judicial review of decisions denying entry to noncitizens living abroad, including Section 7031(c) designations.  Congress established a comprehensive statutory framework for judicial review of decisions concerning the

25

ability of certain noncitizens physically present in the United States to enter or remain in this country. *See* 8 U.S.C. § 1252. But neither Section 1252 nor any other provision of the Immigration and Nationality Act provide for judicial review of visa determinations pertaining to noncitizens physically outside this country, and Congress has not authorized judicial review of visa denials. *See, e.g.*, 6 U.S.C. § 236(f); *see id.* § 236(b)(1), (c)(1). Similarly, Congress has banned judicial review of visa revocations (subject to a narrow exception inapplicable to noncitizens abroad). *See* 8 U.S.C. § 1201(i). And when the Supreme Court held that noncitizens physically present in the United States—but not noncitizens abroad—could seek review of their exclusion orders under the APA, *see Brownell v. We Shung*, 352 U.S. 180, 184-86 (1956), Congress responded by abrogating that ruling. *See* Act of Sept. 26, 1961, Pub. L. No. 87-301, § 5(a), 75 Stat. 650, 651-53; *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1157-62 (D.C. Cir. 1999) (recounting legislative history). The House Report accompanying the abrogating statute explained that APA suits would "give recognition to a fallacious doctrine that an alien has a 'right' to enter this country which he may litigate in the courts of the United States against the U.S. Government as a defendant." H.R. Rep. No. 87-1086, at 33 (1961), *reprinted in* 1961 U.S.C.C.A.N. 2950, 2976.

Given these fundamental and longstanding principles of nonreviewability espoused by the Supreme Court, as well as Congress' disinclination to allow for judicial review, courts formulated the rule that the denial or revocation of a visa by a consular officer abroad "is not subject to judicial review . . . unless Congress says otherwise." *Saavedra Bruno*, 197 F.3d at 1159. This "doctrine of consular nonreviewability," *id.*, however, is just one manifestation of a broader principle of nonreviewability that merely reflects the context in which the principle most often arises—*i.e.*, challenges to decisions by consular officers adjudicating visa applications. But the principle

26

underlying that doctrine applies regardless of the legal basis under which the Executive denies an alien entry into the United States.

**B.      Plaintiffs Cannot Challenge the Secretary's 7031(c) Determination**

This bar on judicial review of the political branches' exclusion of noncitizens abroad forecloses Plaintiff's challenge to his Section 7031(c) designation.  When the Secretary possesses credible information of an individual's involvement in significant corruption, Congress requires the Secretary to "publicly or privately designate or identify" such an individual.  *See* Section 7031(c).  As a result, these individuals are ineligible for entry into the United States; and any arguments that such individuals should be admitted nonetheless should be left to the political branches, without judicial intervention. *See Rai v. Biden*, 567 F. Supp. 3d 180, 194 (D.D.C. 2021) (commenting that the Immigration and Nationality Act "exudes deference to the President in every clause") (quoting *Hawaii*, 138 S. Ct. at 2408).  The principles that generally bar the courts from reviewing visa denials of individual consular officers should also bar review of decisions by the Secretary grounded in sensitive foreign affairs and national security considerations to revoke visas or deny entry of certain foreign corrupt government officials.  It would be likewise counterintuitive to think that Congress intended for federal courts to review Section 7031(c) designations considering its consistent disinclination to authorize the review of decisions regarding an alien's ability to enter this country.  Thus, Plaintiff should not be permitted to use the instant lawsuit to circumvent principles set out in Supreme Court precedent.

In an analogous case, a member of this Court concluded that it lacked the authority to consider a decision by the Secretary that would lead to the visa revocation of an alien present in the United States.  *See Nkrumah v. Pompeo*, No. 20-CV-01892 (RJL), 2020 WL 6270754, *1 (D.D.C. Oct. 26, 2020).  In *Nkrumah*, a Ghanaian citizen challenged the Department of State's

determination, pursuant to 22 U.S.C. § 288(d), that her presence in the United States was not desirable, which would ultimately result in the revocation of her G-4 visa.[6]  *Id.*  When assessing whether the plaintiff had demonstrated a likelihood of success on the merits for purposes of a request for a preliminary injunction, the Court determined that it could not assess the undesirability determination.  *Id.* at *2.  The Court explained that "the decision to admit or exclude a foreign national is a particularly sensitive area of Executive discretion," and therefore concluded that it was "'not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien.'"  *Id.* (quoting *Saavedra Bruno*, 197 F.3d at 1159).  As in *Nkrumah*, the Court should not second-guess a decision made by the Secretary—here, Plaintiff's involvement in significant corruption as a foreign government official—that could ultimately lead to the revocation or denial of a visa.

Thus, the Court should decline to consider the propriety of Peevski's Section 7031(c) designation.

### C.    Plaintiffs Similarly Cannot Use the APA as a Vehicle to Challenge Peevski's Section 7031(c) Designation

Plaintiffs erroneously suggest that Congress has authorized judicial review of his Section 7031(c) designation under the APA.  *See* Am. Compl. ¶¶ 67-71.  But "[i]t is elementary that '[t]he United States, as sovereign, is immune from suit save as it consents to be sued[.]'"  *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").  Two limitations embedded in the APA warrant dismissal of Peevski's challenge

---

[6]  A G-4 visa is available to qualifying officers and employees of international organizations and their immediate family members.  *See* 8 U.S.C. § 1101(a)(15)(G).

to his Section 7031(c) designation pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### 1.   The Nature and Consequences of Peevski's Section 7031(c) Designation Preclude this Court's Review

The APA does not apply "to the extent that . . . statutes preclude judicial review[.]"  5 U.S.C. § 701(a)(1).  This determination is made "not only from [a statute's] express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  The Supreme Court reaffirmed the principles embraced in *Block*, acknowledging that the APA's presumption of judicial review of agency action "'may be overcome by inferences of intent drawn from the statutory scheme as a whole.'"  *Sackett v. EPA*, 566 U.S. 120, 128 (2012) (quoting *Block*, 467 U.S. at 349).

In contrast to the ordinary presumption that the APA provides for the district courts' consideration of final agency actions, the D.C. Circuit determined, in a comparable context, that it could infer that the immigration laws precluded judicial review.  *See Saavedra Bruno*, 197 F.3d at 1162 (citing 5 U.S.C. § 701(a)(1)).  In *Saavedra Bruno*, the D.C. Circuit held that it could not assess the propriety of the decision of a consular officer to deny a visa, even though Congress had not expressly stated that the district court's review was foreclosed. *Id.*  Indeed, Congress had no need to expressly say as much "[g]iven the historical background against which it has legislated over the years[.]" *Id.*  The D.C. Circuit observed that Congress could "safely assume" that noncitizens could not challenge consular officers' visa decisions in federal court "unless legislation specifically permitted such actions." *Id.*  And the D.C. Circuit went on to note that "[w]hen it

comes to matters touching on national security or foreign affairs—and visa determinations are such matters—the presumption of review runs aground." *Id.* (citation omitted).

The Court should reach the same conclusion in this case. Congress has no need to explicitly state and could "safely assume" that this Court cannot review the Secretary's decision to designate Plaintiff under Section 7031(c), a decision that has the same practical consequence that the D.C. Circuit faced in *Saavedra Bruno*—the exclusion from the United States of non-resident noncitizens living abroad. As the *Saavedra Bruno* decision makes clear, the Secretary's designation of Plaintiff implicates the Executive's national security and foreign policy prerogatives that overcome the presumption that the APA allows judicial review. Put another way, the presumption of judicial review in this case, as in *Saavedra Bruno*, "is the opposite of what the APA normally supposes." 197 F.3d at 1162.

Further, the nature of Section 7031(c) designations—the exclusion from the United States of corrupt foreign government officials—would make APA review of the Secretary's decision particularly misguided. *See Block*, 467 U.S. at 345. As discussed above, the Supreme Court has long recognized "the power to exclude aliens 'as inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government[.]'" *Saavedra Bruno*, 197 F.3d at 1159 (quoting *The Chinese Exclusion Case (Ping v. United States)*, 130 U.S. 581, 609 (1889)); *see also Harisiades*, 342 U.S. at 588-89 ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, [and] the war power[.]"). The Supreme Court has emphasized that "[b]ecause decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are

frequently of a character more appropriate to either the Legislature or the Executive.'" *Hawaii*, 138 S. Ct. at 2418-19 (citation omitted).

The Court should reject Plaintiffs' effort to use the APA to second-guess the Secretary's Section 7031(c) designation.  Based on credible information, the Secretary determined that Peevski engaged in significant corruption as a foreign government official.  *See* U.S. Dep't of State, *Public Designation of Five Bulgarian Public Officials Due to Involvement in Significant Corruption* (June 2, 2021), https://www.state.gov/public-designation-of-five-bulgarian-public-officials-due-to-involvement-in-significant-corruption/.  Taking into account foreign policy and national security factors, the Secretary publicized the designations of Plaintiff and some of his immediate family members under Section 7031(c), which renders them ineligible for entry into the United States. *Id.* ("Today's actions reaffirm our commitment to supporting rule of law and strengthening democratic institutions in Bulgaria.").  The APA is not a basis to challenge determinations that federal courts have consistently found should be left to the Executive.

Nor is the APA a mechanism for Plaintiff to challenge his Section 7031(c) designation. *See Block*, 467 U.S. at 345.  Congress has consistently declined to allow judicial review of decisions to exclude noncitizens living abroad, which would be the precise result in the event the Court permits Plaintiff's lawsuit to proceed.  While Congress allows judicial review of some immigration decisions for certain noncitizens physically present in the United States, *see* 8 U.S.C. § 1252, it has not authorized judicial review of such noncitizens' visa denials, *see, e.g.*, 6 U.S.C. § 236(f), or visa revocations, 8 U.S.C. § 1201(i).  And when the Supreme Court held that noncitizens physically present in this country could seek review of their exclusion orders under the APA, *see We Shung*, 352 U.S. at 184-86, Congress responded by abrogating the Court's decision.  *See Saavedra Bruno*, 197 F.3d at 1157-62 (recounting legislative history).  Finally,

Congress is well-aware of the long-standing principle of nonreviewability in this context, and by enacting Section 7031(c) without explicitly authorizing judicial review, it should be presumed Congress intended to exclude such review.  This is especially true given that Congress has passed a version of this provision in every annual appropriations act for the Department of State since 2008, with substantive changes made in 2012, 2014, 2015, and 2017.  Congress, however, has never altered the statute to allow for judicial review of the Secretary's Section 7031(c) designations.

Section 7031(c) designations implicate fundamental issues at the intersection of national security, foreign policy, and immigration prerogatives that are precluded from judicial review under the APA.  *See Saavedra Bruno*, 197 F.3d at 1160 (describing it as "unmistakable" that the immigration laws "preclude judicial review" of consular visa decisions); *see also Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022) ("[T]he Court has taken care to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy,'" and declined to "'run interference in [the] delicate field of international relations' without 'the affirmative intention of the Congress clearly expressed.'") (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115-16 (2013)).

## 2.    Section 7031(c) Designations Constitute Agency Decisions Committed to the Department of State's Discretion

Although the APA "embodies the basic presumption of judicial review," *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967), Plaintiffs "must first clear the hurdle" of 5 U.S.C. § 701(a)(2).  *Heckler v. Chaney*, 470 U.S. 821, 828 (1985).  Section 701(a)(2) precludes from judicial review any action that "is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  An agency action is committed to agency discretion by law and thus not subject to APA review if "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler*, 470 U.S. at 830.  Agency action is unreviewable in such a

situation because "the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." *Sierra Club*, 648 F.3d at 855 (citation omitted).  To determine whether a matter has been committed to agency discretion, the D.C. Circuit considers "the nature of the administrative action at issue," as well as "the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Id.* (citation omitted).

Here, both factors support the conclusion that the Secretary's Section 7031(c) designations are committed to the agency's unreviewable discretion.[7]  Section 7031(c)(1)(A) authorizes the Secretary to make a finding that "credible" information established an individual's involvement in "significant corruption," while Section 7031(c)(1)(B) affords the Secretary wide latitude to designate such an individual publicly or privately.  Unlike the Secretary, the district courts lack the foreign affairs expertise and regional knowledge needed to properly assess the credibility of information about an alien's possible involvement in corruption, or whether such corruption rises to the level that it may be deemed "significant."  Likewise, the district courts are not well-suited to question the Secretary's decision about whether to make a designation public or private, a determination that necessitates careful consideration of foreign policy, political, and diplomatic variables.  *Cf. Nkrumah*, 2020 WL 6270754, at *3 (noting that the Secretary's "undesirability" determination "touches at the heart of foreign policy, diplomatic relations, the war power, and other key Executive interests").  Further, Section 7031(c) neither provides guidance about what

---

[7]  While Section 7031(c)(1)(A) dictates that a foreign government official whom the Secretary determines to be engaged in significant corruption "shall" be ineligible for entry into the United States, this immigration consequence stems from the Secretary's discretionary determination. Similarly, the Secretary must make a public or private designation pursuant to Section 7031(c)(1)(B), but this step need only occur once the Secretary makes his or her discretionary determination.

constitutes "credible" information nor defines "significant corruption."  And similarly, Section 7031(c) does not set forth a standard for the Secretary to follow when assessing whether a designation should be public or private, such as factors or considerations that can be weighed and evaluated.  The district courts, therefore, are particularly ill-equipped to assess the propriety of Section 7031(c) determinations, and as such, these determinations should be left to the Secretary's discretion without judicial interference.

### D.   A Member of this Court has Held that Plaintiff's Challenge to the Secretary's Section 7031(c) Designation is Not Justiciable

Another member of this Court has determined that it cannot assess the propriety of a designation made pursuant to Section 7031(c) absent affirmative authorization for judicial review by Congress.[8]  *See Bautista-Rosario v. Mnuchin*, 568 F. Supp. 3d 1 (D.D.C. 2021).  In *Bautista-Rosario*, the plaintiffs—a senator from the Dominican Republic and several of his family members—challenged their Section 7031(c) designations under the APA.  *Id.* at 4-5.  The Court first observed that the Supreme Court has held that "immigration policy and decisions to admit or exclude aliens are inherently political, implicating 'the conduct of foreign relations, the war power, and the maintenance of a republican form of government.'"  *Id.* at 6 (quoting *Harisiades*, 342 U.S. at 588-89).  The Court went on to note that the district courts "are neither well-structured nor authorized to make such policies, and thus it is well-established that 'it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien.'"  *Id.* (quoting *Knauff*, 338 U.S. at 543).  The Court explained that generally speaking, Congress has not authorized the district courts to review visa

---

[8]  Defendants are aware of only one other district court case to raise these issues.  Although the case and the memorandum opinion and order remain under seal, the district court granted judgment for the Government.

denials or visa revocations for noncitizens living abroad.  *Id.* (citing 6 U.S.C. § 236(f); 8 U.S.C. § 1201(i)).  And although 7031(c) designations "are not merely visa denials or revocations," the Court found that the plaintiffs failed to identify any statutory authority that allowed it to assess the propriety of Section 7031(c) designations.  *Id.*

Further, the Court rejected the plaintiffs' argument that the APA allowed the Court to review Section 7031(c) designations.  *Id.*  The Court reasoned that "by its own terms the APA does not apply 'to the extent that  . . . [other] statutes preclude judicial review.'"  *Id.* (quoting 5 U.S.C. § 701(a)(1)).  The Court observed that the Supreme Court has broadly interpreted this limitation, "concluding that a statute may preclude APA review 'not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.'"  *Id.* (quoting *Block*, 467 U.S. at 345).  The Court explained that "the statutory scheme and the nature of the administrative action" preclude its review of Section 7031(c) designations.  *Id.* at 6-7.  In doing so, the Court cited: (1) Congress' express prohibition of judicial review of visa denials and revocations; and (2) the presumption of non-reviewability of alien exclusion determinations.  *Id.* at 7.  Like the D.C. Circuit's inference "that the immigration laws preclude judicial review of consular visa decisions," the Court determined "the immigration laws preclude judicial review of Section 7031(c) designations."  *Id.* (quoting *Saavedra Bruno*, 197 F.3d at 1162).

## IV.    Treasury did not Violate the APA by Designating Peevski and the Companies He Owns or Controls (Count III)

Similarly, Plaintiffs erroneously argue that their designations pursuant to E.O. 13818  were arbitrary and capricious in violation of the APA.  *See* Am. Compl. ¶¶ 67-71.  As addressed in detail

below, the Court should afford substantial deference to OFAC's decision, which was based on more than adequate unclassified evidence.

### A.      OFAC's Designations are Entitled to Substantial Deference

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).  The court should uphold an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416; *accord City of Huntington v. U.S. Dep't of Hous. & Urb. Dev.*, 466 F. Supp. 3d 30, 32 (D.D.C. 2020).  An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court may not "substitute its judgment for that of the agency"; rather, the agency's decision should be affirmed as long as it is supported by a rational basis.  *Id.*; *see also Zevallos*, 10 F. Supp. 3d at 118-19.

This deference is further heightened in cases, like this one, that involve national security and foreign affairs.  *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and

administrative law—is extremely deferential.").  The Supreme Court has emphasized the need for

courts to grant this heightened deference, even when considering constitutional claims.  *Holder v.*

*Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).   And the Courts have applied such

heightened deference in economic sanctions cases, such as the instant matter.  *See Karadzic v.*

*Gacki*, 602 F. Supp. 3d 103, 115 (D.D.C. 2022) (recognizing that when assessing an OFAC agency

action the "standard of review in the APA context is not demanding . . . [and] [t]his is especially

true when the actions under review involve foreign affairs and national security"); *Olenga v. Gacki*,

507 F. Supp. 3d 260, 280 (D.D.C. 2020) ("The D.C. Circuit has shown 'extreme' deference to

blocking orders, which fall 'at the intersection of national security, foreign policy, and

administrative law.'") (citation omitted); *Zevallos*, 10 F. Supp. 3d at 119 (recognizing additional

deference beyond that typically accorded to an agency under the APA); *Zarmach Oil Servs., Inc.*

*v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("[C]ourts owe a substantial

measure of 'deference to the political branches in matters of foreign policy,' including cases

involving blocking orders." (citation omitted)); *Holy Land Found. for Relief & Dev. v. Ashcroft*,

219 F. Supp. 2d 57, 84 (D.D.C. 2002) ("Blocking orders are an important component of U.S.

foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular

deference."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *see also Pejcic v. Gacki*, Civ. A. No. 19-2437

(APM), 2021 WL 1209299, at *6 (D.D.C. Mar. 30, 2021) ("The court's review is particularly

deferential in this case because the issues at hand implicate national security, foreign policy, and

administrative law."); *Rakhimov v. Gacki*, Civ. A. No. 19-2554 (JEB), 2020 WL 1911561, at *6

(D.D.C. Apr. 20, 2020), *appeal dismissed*, No. 20-5121, 2020 WL 4107145 (D.C. Cir. July 1,

2020) ("The D.C. Circuit . . . has urged courts to be particularly deferential to executive blocking

orders, decisions 'at the intersection of national security, foreign policy, and administrative law.'")

(citation omitted).

### B.     OFAC Supported Plaintiffs' Designations with More than Adequate Unclassified Evidence

Plaintiffs wrongly argue that the OFAC designations rest on insufficient evidence and are

thus arbitrary and capricious in violation of the APA.  *See* Am. Compl. ¶¶ 67-71.  A review of

available unclassified information readily dispels this notion.  *See* A.R. 24-28.  In designating

Plaintiffs, OFAC explained that Peevski served as a Bulgarian member of parliament who

"regularly engaged in corruption, using influence peddling and bribes to protect himself from

public scrutiny and exert control over key institutions and sectors in Bulgarian society."  A.R. 26.

Of particular note, Peevski engaged in corruption through Zhelyazkov, the former Deputy Chief

of the Bulgarian State Agency for Technical Operations and former DANS officer who was

appointed to the National Bureau for Control on Special Intelligence-Gathering Devices.  *Id.*  In

particular, Peevski conducted a bribery scheme through Zhelyazkov, involving Bulgarian

residency documents for foreign persons, and he also bribed government officials through various

means in exchange for their information and loyalty.  A.R. 27; *see also* OFAC Denial Letter at 3

("OFAC has identified additional reporting that . . . [i]n 2018 a senior Bulgarian official was

appointed to a high-ranking leadership position, orchestrated by Zhelyazkov to ensure that Peevski

had loyalty and control.").  Further, Peevski received information from Zhelyazkov that he

received by bribing senior Bulgarian government officials.  A.R. 27.  Peevski also placed an

official in a leadership position in 2019 to embezzle funds for him and Zhelyazkov.  *Id.*  Finally,

Peevski masterminded a scheme to sell Bulgarian residency documents; company representatives

paid bribes to Bulgarian officials to ensure their clients received citizenship documents

immediately, rather than making the $500,000 deposit or waiting the five years for a legitimate request to be processed. *Id.*

Defendants reasonably determined that Plaintiffs met the criteria set forth in E.O. 13818, and there is no basis to conclude Defendants violated the APA. *See Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 42-43 (holding that an agency's decision is not arbitrary or capricious if it has a rational basis); *Airmotive Eng'g Corp. v. FAA*, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (concluding that an agency's finding of fact are "conclusive" when "supported by substantial evidence" meaning information that "a reasonable mind might accept as adequate to support a conclusion") (citations omitted).   Though the unclassified information detailed above provides more than sufficient evidence to support OFAC's designations, Defendants lodge for the Court the full evidentiary memorandum and supporting exhibits, including any classified or otherwise protected information, *ex parte*, *in camera*.[9]   *See* 50 U.S.C. § 1702(c) ("In any judicial review of a determination made under this section, if the determination was based on classified information . . . such information may be submitted to the reviewing court ex parte and in camera.").   *Cf. Zevallos v. Obama*, 793 F.3d 106, 117 (D.C. Cir. 2015) (concluding that due process only requires the disclosure of unclassified information underpinning a designation).

## V.   Plaintiffs Received Sufficient Information to Meaningfully Petition OFAC for Reconsideration (Count IV)

Contrary to Plaintiffs' ineffective assertion otherwise, OFAC afforded Plaintiffs a timely, meaningful, and comprehensive reevaluation of their designations. *See* Am. Compl. ¶¶ 72-79. OFAC responded to the petition a month before Plaintiffs filed the Amended Complaint. Pursuant

---

[9]  The Government will lodge the classified version of the administrative record with the Court Information Security Office once the parties have filed all of their respective briefs, at which point the Court may request the classified record at its convenience.   *See* 50 U.S.C. § 1702(c).   The Government is also prepared to lodge, at the Court's request, the administrative record for its December 2022 denial of Plaintiffs' reconsideration petition.

to the applicable OFAC regulation, Plaintiffs filed a petition for reconsideration in February 2022. *See* 31 C.F.R. § 501.807 (explaining that a blocked person "may seek administrative reconsideration of his, her or its designation . . . , or assert that the circumstances resulting in the designation no longer apply, and thus seek to have the designation rescinded"); *see also* OFAC Denial Letter at 1. "After reviewing all of the evidence in the record regarding [Plaintiffs'] designation . . . , including all of the materials [Plaintiffs] submitted," OFAC denied the request for reconsideration on December 5, 2022. OFAC Denial Letter at 2. Upon the completion of OFAC's comprehensive review, Plaintiffs now claim that they have been "deprived of their ability to effectively seek reconsideration of their designations[.]" Am. Compl. ¶ 78. This is not the case.

As addressed above, Defendants provided Plaintiffs all of the available unclassified information supporting their designations under E.O. 13818. *See* A.R. 24-28. Indeed, OFAC explained that their designations rested on evidence demonstrating that Peevski:

- Served as a Bulgarian member of parliament who "regularly engaged in corruption, using influence peddling and bribes to protect himself from public scrutiny and exert control over key institutions and sectors in Bulgarian society";

- Engaged in corruption through Zhelyazkov, the former Deputy Chief of the Bulgarian State Agency for Technical Operations and former DANS officer who was appointed to the National Bureau for Control on Special Intelligence-Gathering Devices;

- Conducted a bribery scheme through Zhelyazkov involving Bulgarian residency documents for foreign persons, as well as to bribe government officials through various means in exchange for their information and loyalty;

- Received information through Zhelyazkov that were the product of the bribery of senior Bulgarian government officials;

- Placed an official in a leadership position in 2019 to embezzle funds for him and Zhelyazkov; and

- Ran a scheme to sell Bulgarian residency documents by which company representatives paid bribes to Bulgarian officials to ensure their clients received citizenship documents

immediately rather than making the $500,000 deposit or waiting the five years for a legitimate request to be processed.

*See* A.R. 24-28.

In response, Plaintiffs submitted to OFAC a lengthy petition for reconsideration responding to the factual grounds for their designations. *See* OFAC Denial Letter. Specifically responding to the allegations pertaining to Zhelyazkov, Plaintiffs argued that Peevski does not have a financial or business relationship with this individual. *Id.* at 3. Moreover, Plaintiffs alleged that the findings from the Bulgarian Specialized Prosecutor Office's investigation into Peevski exonerate him from the allegations of corruption in the OFAC press release. *Id.* at 3-4. Plaintiffs also directly responded to OFAC's conclusion that Peevski engaged in a scheme to sell Bulgarian residency documents, which Plaintiffs referred to as the "Golden Passport" scheme. *Id.* at 4-5. Plaintiffs went on to allege that OFAC's determination that Peevski engaged in corruption was based on rumors, innuendo, and speculation generated primarily by Peevski's political opponents. *Id.* at 3. As the above discussion illustrates, Plaintiffs received all available unclassified information underpinning his designation, and he provided a robust, albeit ultimately unsuccessful, rebuttal, thus demonstrating that they received a meaningful opportunity to contest their designations even if they did not like the result.

To the extent sought, Plaintiffs are not entitled to unclassified summaries of the classified basis for their designations. *See* Am. Comp. ¶¶ 72-79. The courts in this Circuit have consistently held that unclassified summaries generally are not required where classified information is part of an administrative record.[10] *See, e.g., Jifry v. FAA*, 370 F.3d 1174, 1183-84 (D.C. Cir. 2004)

---

[10] Although the Ninth Circuit remarked, in the context of reviewing Treasury's designation of a non-profit corporation as a terrorist organization, that unclassified summaries "could provide helpful information," it did not hold that they were necessary in every instance. *See Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 983 (9th Cir. 2012) ("[A]n

(holding that the Government satisfied the notice requirements of due process by informing foreign pilots that their airmen certificates had been revoked based on the agency's determination that the pilots were a "security threat."); *Holy Land Found. for Relief & Dev.*, 333 F.3d at 164  (rejecting plaintiffs' argument "that due process prevents its designation [by Treasury] based upon classified information to which it has not had access"); *FBME Bank Ltd v. Lew*, 125 F. Supp. 3d  109, 119 n.2 (D.D.C. 2015) (concluding that, while "unclassified summaries of classified information on which an agency relied may be helpful to litigants, they are not required"); *Rakhimov*, 2020 WL 1911561, at \*7 (declining to "impose the unprecedented remedy of mandating the issuance of an unclassified summary or allowing his counsel access to classified material").

   In the event Plaintiffs contend that OFAC's reconsideration process was unnecessarily protracted, this argument likewise falls flat.  *See* Am. Compl. ¶¶ 72-79.  First and foremost, such an allegation is moot because OFAC denied Plaintiffs' petition for reconsideration on December 5, 2022.  *See* OFAC Denial Letter.  "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted).  This principle has been routinely recognized in cases, such as this, in which the defendant agency issues a decision on a pending administrative application during the pendency of litigation.  *See, e.g.*, *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1205-06 (D.C. Cir. 2013) (explaining that APA unreasonable delay claim was moot after the Fish and Wildlife Service processed and denied applications when case was pending

---

unclassified summary may not be possible because, in some cases, the subject matter itself may be classified and cannot be revealed without implicating national security."); *id.* at 984 ("We agree that a case-by-case approach is proper.  As we have alluded to earlier, the proper measures in any given case will depend on a number of factors.").

before district court).  Further, the reconsideration regulation does not require OFAC to issue a decision on any particular timetable; the regulation merely provides that "[a]fter the Office of Foreign Assets Control has conducted a review of the request for reconsideration, it will provide a written decision to the blocked person[.]"  *See* 31 C.F.R. § 501.807(d).  The pace of OFAC's administrative review process, therefore, should be considered discretionary.  *See Beshir v. Holder*, 10 F. Supp. 3d 165, 172 (D.D.C. 2014) ("[B]ecause the pace of the adjudication of Beshir's application is discretionary, the Court lacks jurisdiction over Beshir's claim that defendants have unreasonably delayed adjudication.").  Here, OFAC issued its decision less than ten months after it received the request for reconsideration, a timetable that can hardly be considered needlessly prolonged.

Also relevant, the OFAC regulation does not limit the number of times Plaintiffs may petition for reconsideration.  *See* OFAC Denial Letter at 6 ("If, in the future, your client decides to pursue the reconsideration process again, your client will need to submit a new request[.]"); *see also Zevallos*, 793 F.3d at 110 ("A designated person can request delisting as many times as he likes.").  After reviewing the comprehensive denial letter, Plaintiffs may choose to reengage in the administrative process in an attempt to persuade OFAC that it reached an erroneous decision.  *See* 31 C.F.R. § 501.807. ("A person may seek administrative reconsideration of his, her or its designation[.]"); *see also, e.g.*, OFAC Denial Letter at 3 ("OFAC has identified additional reporting that . . . [i]n 2018 a senior Bulgarian official was appointed to a high-ranking leadership position, orchestrated by Zhelyazkov to ensure that Peevski had loyalty and control.").  Or alternatively, Plaintiffs could file another petition for reconsideration if they believe that circumstances have changed warranting the rescission of their designations.  *See* 31 C.F.R.

§ 501.807 ("A person may . . . assert that the circumstances resulting in the designation no longer apply[.]").

In sum, Defendants provided Plaintiffs with all unclassified information that justified their designations, conducted a comprehensive review of all available information, and made a reasoned decision in a timely manner. While Plaintiffs understandably do not like the outcome of the reconsideration process, they were afforded a meaningful opportunity to challenge their designations. Nothing more is required by the APA or the applicable OFAC regulation.

## CONCLUSION

For all of the reasons discussed above, the Court should grant Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment.

Dated:  February 27, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER
Assistant Director

/s/ Stephen M. Elliott
STEPHEN M. ELLIOTT (PA Bar# 203986)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel:  (202) 353-0889  Fax:  (202) 616-8470
E-mail:  stephen.m.elliott@usdoj.gov

Counsel for Defendants