# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DELYAN SLAVCHEV PEEVSKI, et al.,

       Plaintiffs,

  v.

JANET YELLEN, Secretary,
Department of the Treasury, et al.,

       Defendants.

**Civ. No. 1:22-cv-02334-TSC**

---

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Kenneth J. Nunnenkamp (Bar No. 420914)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 739-6000
Fax: (202) 739-6001
Email: kenneth.nunnenkamp@morganlewis.com

Counsel for Plaintiffs

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

SUMMARY OF THE ARGUMENT ........................................................................... 5

    I.    *Loper* Establishes That No Deference is Due Defendants' Interpretations .......... 6

    II.    Section 7031(c) Unambiguously Limits Coverage to Persons Who Are "Officials of Foreign Governments" ....................................................................................... 9

    III.    If the Court Concludes That "Officials of Foreign Governments" is Ambiguous, It Should Conclude That This Does Not Include Former Officials ........................ 10

    IV.    *Loper* Makes Clear That Statutory Interpretation Cannot be Nonjusticiable ...... 12

    VI.    The Court Should Interpret Section 807 to Require Timely Action by OFAC ... 18

CONCLUSION........................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams Fruit Co. v. Barrett*,
    494 U. S. 638 (1990) ........................................................................................................8

*Arlington v. FCC*,
    569 U. S. 290 (2013) ......................................................................................................16

*Auer v. Robbins*,
    519 U. S. 452 (1997) ..........................................................................................8, 16, 17

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) .................................................................................................. *passim*

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012) ......................................................................................................17

*Doshi v. Blinken*,
    No. 23-3613, 2024 WL 3509486 (D.D.C. July 22, 2024) ....................................13

*Jicarilla Apache Tribe v. FERC*,
    578 F. 2d 289 (CA10 1978) ............................................................................................8

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) (plurality opinion) ...................................................... *passim*

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) ........................................................................................ *passim*

*Marbury v. Madison*,
    5 U.S. 137 (1803) ...........................................................................................................7

*Rahmani v. Yellen*,
    No. 24-cv-0285, 2024 WL 1701681 (D.D.C. Apr. 19, 2024) .....................13, 14, 15

*Relentless, Inc. v. Department of Commerce* ..............................................................1

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) ........................................................................................................7

*West Va. Highlands Conservancy, Inc. v. Norton*,
    343 F. 3d 239 (CA4 2003) ..............................................................................................8

*Wisconsin Central Ltd. v. United States*,
    585 U. S. 274 (2018) ......................................................................................................13

**Statutes**

Administrative Procedure Act 5 U.S.C. § 706.............................................................3, 6, 7

Department of State, Foreign Operations, and Related Programs Appropriations
    Act, 2008, Pub. L. No. 110-161, § 699L, 121 Stat. 1844, 2373–74 (2007).................... *passim*

Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1(f)(1)............................................................11

Foreign Extortion Prevention Act, 18 U.S.C. § 201(a)(4)...........................................................11

**Other Authorities**

31 C.F.R. § 501.807....................................................................................................... *passim*

31 C.F.R. § 1010.605(p) ....................................................................................................12

U.S. Dep't of the Treasury, *Filing a Petition for Removal from an OFAC List*
    https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/filing-a-
    petition-for-removal-from-an-ofac-list .........................................................................17

Malcolm M. Feeley, *The Process Is the Punishment*: *Handling Cases in a Lower
    Criminal Court* (1979) ...............................................................................................18

*Regulatory Hide and Seek: What Agencies Can (and Can't) Do to Limit Judicial
    Review,* 52 B.C. L. Rev. 1687 (2011) .........................................................................10

S.C. Res. 2744 (July 19, 2024),
    https://www.un.org/en/media/accreditation/pdf/SCRes1.pdf ................................................19

Partners For Justice, *The Process is the Punishment: How the Criminal Legal
    System Punishes Those Presumed Innocent* (June 2013), https://assets-
    global.website-
    files.com/6082d94f16ba7348d54d034d/653a98e1d8418b592e8e65c9_The%2
    0Process%20is%20the%20Punishment%20(updated).pdf....................................................18

## INTRODUCTION

Plaintiffs Delyan Slavchev Peevski ("Mr. Peevski"), Intrust PLC EAD, Int Ltd EEOD, Int Invest EOOD, BM Systems EAD, Inttrafik EOOD and Real Estates Int Ltd EOOD (collectively "Plaintiffs") submit this supplemental brief in accordance with the Court's Orders of January 24, 2024, and July 25, 2024.  On January 24, 2024, the Court stayed these proceedings because the Government's Motion to Dismiss relies on *Chevron* deference."[1]  On July 25, 2024, the Court established the schedule for this supplemental briefing.

Plaintiffs incorporate by reference the factual recitations in their prior submissions and include here a factual recitation only insofar as relevant to the discussion.  Plaintiffs appreciate the opportunity to explain, in light of the Supreme Court's recent decisions in the companion cases of *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) and *Relentless, Inc. v. Department of Commerce*, (collectively "*Loper*"), why Defendants' motion to dismiss and their motion for summary judgment should be denied.

As the Court knows, Plaintiffs brought this action challenging two separate actions by two separate agencies:

1.      Plaintiff Peevski challenges the State Department Defendants' action designating him under Section 7031(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008, Pub. L. No. 110-161, § 699L, 121 Stat. 1844, 2373–74 (2007) ("Section 7031(c)").[2]  In response, Defendants raised four arguments:

---

[1]      While the Court's Order focused on Count I, Plaintiffs address *Loper's* impact on other arguments advanced by Defendants for completeness.

[2]      The State Department included Mr. Peevski's immediate family members in that designation.  Since the only basis for their inclusion was his designation, they are not separate parties here, as Mr. Peevski's removal would presumably mandate their removal as well.

a.      *Chevron* deference requires the court to "defer to State's permissible interpretation of the term 'officials[.]'" Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. Ex. 1 at 17–22 (Feb. 27, 2023), ECF No. 29-1 ("Defs.' Br."). As discussed below, the Supreme Court recently clarified that this deference is not appropriate, and therefore, the Court should interpret Section 7031(c) to determine the "best" meaning of any ambiguous terms in question, though Plaintiffs maintain that the relevant term is "officials of foreign governments" and that term is unambiguous.

b.      Ultra vires review is inappropriate because "*Plaintiffs . . . have an alternative mechanism to challenge State's allegedly improper interpretation of Section 7031(c)*" – the APA. *Id.* at 23 (emphasis added).

c.      With no apparent sense of irony, the third assertion Defendants made is that any and all actions by Defendants under Section 7031(c) are "non-justiciable." *Id.* at 24–33. Defendants even title a whole brief section, "Plaintiffs Similarly Cannot Use the APA to Challenge Peevski's Section 7031(c) Designation." *Id.* at 28. As discussed in Plaintiffs' initial briefing, Defendants have to work hard to recast the actual arguments in order to try to squeeze out this oddly shaped position—Mr. Peevski can apparently challenge the Section 7031(c) action using the APA, but this Court cannot consider that challenge, even under the APA.

This is accomplished through application of the logical fallacy of the false premise: The false premise asserted by the Defendants is that Mr. Peevski is challenging the exclusion resulting from the designation. In fact, Mr. Peevski challenges whether the Department has the *authority* to use that statute against him -- a person who at the time of his designation was *not* an official of a foreign government, which is a prerequisite under Section 7031(c).

Only by recharacterizing Mr. Peevski's position can Defendants reach the claim they want to confront – the decision to impose the punishment inflicted by the designation, a ban on entry

into the U.S.  Defendants assume for purposes of this argument that anything they do can be authorized by Section 7031(c), so long as the State Department says that is why it is acting. Defendants appear to posit that there is no boundary, legal or otherwise, to action under that statute, and anything the Department does whilst incanting the section, is insulated from judicial review.

Defendants' prior briefing seems to assert that even if Section 7031(c) does not apply to Mr. Peevski, the Court should not review that action because ultimately, even after it is illegally applied, it relates to "entry" into the United States.  But once *Loper* replaced Defendants' unbridled discretion to interpret a statute to mean anything the agency wanted with the requirement that a court discern the "best" interpretation, Defendants' argument becomes superfluous.

d.    If Section 7031(c) can be expanded to apply to persons not included in the statute by Congress, Defendants still seek to shield their decisions from review because Congress mandated that entry be denied.  This argument, addressed in Plaintiffs' Reply Memorandum, fails to recognize that the *decision* made under Section 7031(c) is not the *entry* decision.  Rather, it is a sanction *designation* decision.  The fact that other members of the Court in another decision did not appreciate this significance does not bind this Court to that incorrect reasoning.  In any event, for purposes of this supplemental submission, this question is mooted once Section 7031(c) is properly interpreted.

2.    All Plaintiffs request declaratory and injunctive relief arising from OFAC's failure to act in accordance with its own regulations.  These claims ask the Court to set aside OFAC's designations because of the irreversible damage arising from OFAC's delay.  While not relying on *Chevron*, *per se*, OFAC argues that its actions are entitled to review under the "deferential standard" in 5 U.S.C. § 706(2)(A) and seeks to engage the Court and Plaintiffs in a review of the agency record that magically appeared only after this action was brought (and even then, more

than two months after).  Seeking to avoid all responsibility and impact for its delay, Defendants claim, under the ill-advised legal doctrine of "better late than never", that OFAC can "moot" Plaintiffs' undue delay claim by finally ending their delay.

Defendants appear to admit their belief that the regulations owe no effective process, arguing "the reconsideration regulation does not require OFAC to issue a decision on any particular timetable."  Defs.' Br. at 43.  Using this "process as punishment" approach, Defendants appear to suggest that they retain the discretion to act on *any* timeline, or never to act at all.  *Loper* makes clear, however, that courts retain the authority to interpret the law, whether statute or regulation.   Thus, the Court should interpret 31 C.F.R. § 501.807 ("Section 807") and determine the process requirements that reflect the best interpretation of the regulation.  *Loper* makes clear that OFAC is not entitled to the type of deference OFAC seeks, and thereby act on any timeline, no matter how unreasonable.  In a post-deprivation challenge, especially, delay is more significant.

As discussed below, *Loper* requires the Court to interpret the applicable regulation. Plaintiffs' claim is that by refusing to decide and refusing to act with even a semblance of timeliness, OFAC abuses any procedural protections embodied in Section 807.  By making the process the punishment, OFAC is subject to judicial scrutiny of the process it uses and the reasonableness of its actions in light of the process its regulations guarantee.  If Section 807 is to have meaning, it must be interpreted to require that OFAC act within a reasonable time frame. *Loper* not only allows, but mandates that the Court determine whether Section 807 contains requirements for the agency to act reasonably under the circumstances.

## SUMMARY OF THE ARGUMENT

While *Loper* is devastating to Defendants' assertions that this Court should defer to the agency's interpretation of the jurisdictional limitation in Section 7031(c), the Court need not be concerned with deference at all because, as Plaintiffs explained in their prior submissions, the term "Officials of foreign governments" unambiguously refers to current officials.  If, however, the Court concludes that this phrase is ambiguous, *Loper* mandates no deference to the agency's proposed interpretation.  Not only does *Loper* direct that interpreting the meaning of ambiguous statutory terms is a clearly judicial determination, and one due no "deference", the Supreme Court's decision refutes virtually every argument advanced by Defendants in support of the opposite position.  Defendants' arguments, as originally framed in their motion to dismiss, consist of the following:

1. *Chevron*[3] requires the Court to defer to the Department even when assessing whether the Department has exceeded its authority.  As discussed below, *Loper* lays this argument to rest, and Plaintiffs presume Defendants will now concede that the legal interpretation of Section 7031(c) is a matter for the Court.

2. The term "officials of foreign governments" is ambiguous and therefore (laying aside the assertions of deference which are no longer applicable) includes anyone who was ever a foreign government official, without any boundaries to cabin in that term.  If this term is ambiguous, it can only include current officials.  Defendants seek to have the Court ignore the modifying adjectival phrase "of foreign governments" to create ambiguity.  *Loper* similarly lays to rest any viability of this argument.

---

[3]     *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

3.  The "text and purpose" of Section 7031(c) allows for an unrestricted application of an otherwise unambiguous term as though it were ambiguous—in other words, the text and purpose of the statute make the term ambiguous and as a result allow for unfettered expansion of it to any length the agency chooses.  This argument violates basic canons of construction, and therefore must be rejected.

Plaintiffs first address the direct and clear impact of *Loper* on the Section 7031(c) claims, and then address Defendants' arguments.

With respect to OFAC's actions, while Defendants did not directly assert *Chevron* deference, they argue that the Court should interpret Section 807 as effectively providing no procedural rights or protections.  Instead, the Court should not allow OFAC to neuter the protections in Section 807 by providing for an indefinite review period.  Plaintiffs' earlier briefs establish the flaws in this approach.  Here, Plaintiffs assert that *Loper* requires the Court to interpret Section 807 and determine whether OFAC's actions violated that provision as interpreted.

## I.     *Loper* Establishes That No Deference is Due Defendants' Interpretations

*Loper* overruled *Chevron*.   In unambiguous terms, the Supreme Court declared that *Chevron* deference, as it was known, ran afoul of the mandate in section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, that requires courts to "hold unlawful and set aside agency action, findings and conclusions found to be . . . not in accordance with law."  *Id.* at § 706(2)(A).  In laying *Chevron* deference to rest, the Court made clear that all of the various progeny and intricacies associated with applying such deference are also overruled.  While *Chevron* deference was never appropriate when a statute is unambiguous, *Chevron*, 467 U.S. at 842–43, the Court made clear that "courts need not and under the APA *may not* defer to an agency interpretation of the law simply because a statute is ambiguous."  *Loper*, 144 S. Ct. at 2273.  *Loper* allows a court to take

an executive agency's interpretation into consideration.  However, given that no deference is due, the agency interpretation is nothing more than "informative," and even then, only when it lies within the agency's particular expertise. *Loper*, 144 S. Ct. at 2267.  But *Loper* makes clear that legal interpretation is in fact never a subject of agency "expertise." *Loper*, 144 S. Ct. at 2267–68 ("[R]esolution of statutory ambiguities involves legal interpretation."); *see Kisor v. Wilkie*, 588 U.S. 558, 580 (2019) (plurality opinion).  Rather, the only "expertise" to be gleaned from the agency is "technical" expertise. *See Loper*, 144 S. Ct. at 2267.

The change brought about by *Loper* is significant.  While agencies may seek to narrow *Loper*'s impact in the hopes of retaining discretion, the Supreme Court was clear that courts retain the authority to effectuate a primary purpose of the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950).  *Loper* reaffirms that the APA "codifie[d] for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury* [*v. Madison*, 5 U.S. 137 (1803)]: that courts decide legal questions by applying their own judgment."  144 S. Ct. at 2261.  Moreover, *Loper* makes clear that section 706 of the APA "prescribes no deferential standard for courts to employ in answering those legal questions." *Id.*  This Court, therefore, retains primary responsibility for interpreting both statute and regulation. *Accord Kisor*, 588 U.S. 558.

The judicial function requires that courts "exercise independent judgment in determining the meaning of statutory provisions." *Loper*, 144 S. Ct. at 2262.  And while the court may elect to consider how the agency interprets the statute, an agency interpretation is worthy of this limited consideration only where the agency provided an interpretation "issued contemporaneously with the statute at issue." *Id.*  Mere agency practice does not constitute an "issued" interpretation.

While Plaintiffs contend that the key phrase at issue in Section 7031(c) – "officials of foreign governments" – unambiguously describes current officials, *Loper* makes clear that even if this Court determines the phrase is ambiguous, the Court should undertake the legal analysis needed to determine the "single, best meaning" of the statute. *Loper*, 144 S. Ct. at 2266. When it comes to resolving statutory ambiguities, "agencies have no special competence." *Id.*

*Loper*'s impact is also appropriately felt in the area of regulatory interpretation as well. Court deference to agency interpretation, sometimes called *Auer* deference, was addressed in the Supreme Court's decision in *Kisor*. The same constitutional dictates that require courts to remain the ultimate arbiters of legal interpretation apply equally to interpreting regulations. While *Kisor* declined to overrule *Auer* completely, the Supreme Court made clear that its ruling was intended to "reinforce its limits." 588 U.S. at 563 ("*Auer* deference is sometimes appropriate and sometimes not. Whether to apply it depends on a range of considerations."). Moreover, like *Loper*, *Kisor* makes clear that deference arises only when the agency has actually interpreted the regulation. The interpretation "must be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views." *Id.* at 577. Further, in order to be accorded deference, the "agency's interpretation must in some way implicate its substantive expertise." *Id.* Finally, in language very similar to that used in *Loper*, the *Kisor* plurality opinion describes when judicial deference is not appropriate:

> Some interpretive issues may fall more naturally into a judge's bailiwick. Take one requiring the elucidation of a simple common-law property term, *see Jicarilla Apache Tribe v. FERC*, 578 F. 2d 289, 292–293 (CA10 1978), or one concerning the award of an attorney's fee, *see West Va. Highlands Conservancy, Inc. v. Norton*, 343 F. 3d 239 (CA4 2003). Cf. *Adams Fruit Co. v. Barrett*, 494 U. S. 638, 649–650 (1990) (declining to award Chevron deference when an agency interprets a judicial-review provision). **When the agency has no comparative expertise in resolving a regulatory ambiguity, Congress presumably would not grant it that authority**.

8

*Id.* at 578 (emphasis added).  *Loper*, therefore, makes clear that these rules of deference are not devices of convenience, but essential to the constitutional scheme.  Moreover, deference is not appropriate when the issue is one traditionally in the realm of court responsibility.  Accordingly, effective process under Section 807 is precisely the sort of judicial expertise upon which *Loper* focuses.  The agency is not well equipped to decide whether it has acted reasonably in abandoning all time limits for its decision making.  Rather, that question is fundamental to a rule of law analysis, a principal recognized even by the United Nations.

## II.   Section 7031(c) Unambiguously Limits Coverage to Persons Who Are "Officials of Foreign Governments"

Plaintiffs set forth in their prior briefing the reasons why Section 7031(c) cannot apply to Mr. Peevski.  Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. & in Support of Pls.' Cross-Mot. for Summ. J. at 32–35 (Apr. 3, 2023), ECF No. 32-1 ("Pls.' Br.").  As noted there, the phrase "Officials of foreign governments" is unambiguous.  Throughout the briefing, Defendants failed to identify anything in Section 7031(c) indicating otherwise -- other than Defendants' practice, for which they provide no basis.  There is no "context" in Section 7031(c) that makes this language ambiguous.  Rather, there is only the unambiguous present tense.

Defendants' effort to create ambiguity reflects one of the concerns raised by the Supreme Court in *Loper*.  Where the agency seeks to expand its power unilaterally, it could lean on (or perhaps rely on) *Chevron* deference to provide the cloak by which no court would subject its view to scrutiny.  *Cf. Loper*, 144 S. Ct. at 2265–66.  Free from the constraints of substantive judicial review, agencies could expand their jurisdiction, and then use the assertion of ambiguity to protect against meaningful review.  As long as the agency interpretation was "permissible" (or "plausible" (*Valerie C. Brannon & Jared P. Cole*, CONG. RSCH. SERV., R44954, *Chevron Deference*: *A Primer*

9

17 (2017) ("*Chevron* deference implicitly acknowledges that an ambiguous statute permits a range of plausible interpretations.")), it could count on *Chevron* deference to provide the path through which the agency could expand its authority.

Defendants' position with respect to the alleged ambiguity in Section 7031(c) brings to life the precise concerns addressed in *Loper*. The Defendants assert amphiboly because it is the only way to support their prior actions. It is undoubtedly apparent to Defendants, as much as to Plaintiffs, that only through alleging ambiguity can they justify usurping Congress' role and expanding Section 7031(c). But *Loper* now makes clear that the Court must not allow such usurpation, especially when it comes to defining the agency's jurisdiction. *See* Bryan Clark & Amanda C. Leiter, *Regulatory Hide and Seek: What Agencies Can (and Can't) Do to Limit Judicial Review,* 52 B.C. L. REV. 1687 (2011) (discussing how agencies use alleged ambiguities to erect barriers to judicial review).

### III.     If the Court Finds That "Officials of Foreign Governments" is Ambiguous, It Should Conclude That This Does Not Include Former Officials

As discussed in Plaintiffs' earlier briefing, Defendants' unrestricted definition of the term "Officials of foreign governments" is not sustainable. *Loper* removes any of the deference upon which Defendants so heavily rely to reach the results they seek.

*Loper* cautions against courts retracting from their duty to exercise independent judgment merely because the agency advances a particular interpretation. 144 S. Ct. 2262–63. While the Supreme Court indicates that "interpretations issued contemporaneously" with a statute may be useful, the State Department has never "issued" an interpretation of this term for Section 7031(c), contemporaneously or otherwise. *Cf. Kisor*, 588 U.S. at 577 ("To begin with, the regulatory interpretation must be one actually made by the agency.") The first public designations under Section 7031(c) occurred in 2018, more than three years after the provision was modified to allow

for the publication of designations, and more than a decade after the original provision was enacted. *See Lisa W. Rosen & Michael A. Weber*, CONG. RSCH. SERV., R46362, *Foreign Officials Publicly Designated by the U.S. Department of State on Corruption or Human Rights Grounds: A Chronology* 1 (2020).   Nothing in those designations addressed any reasoning behind the Department's desire to expand the statute beyond its terms.  The State Department has never issued regulations under Section 7031(c) and has not provided a process for reconsideration or appeal of such designations.  Nor did Congress delegate to the State Department any authority to interpret "Officials of foreign governments."  *See Loper*, 144 S. Ct. at 2263.

Any ambiguity is readily resolved in favor of limiting the phrase to its natural, present tense, rather than conducting a tortured analysis seeking to justify the later expansion of the statute. For example, in addition to the discussion in Plaintiffs' briefs, recounting the different use of present or former in both the INA and other statutes, *see* Pls.' Br. at 33–34, the Court can find examples in other statutes.  Notably, the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1(f)(1) and the recently enacted Foreign Extortion Prevention Act, 18 U.S.C. § 201(a)(4) ("FEPA"), show Congress knows how to be clear when it wishes to capture former officials in statutory definitions. The FCPA definition of public official captures current officials, defining that term, in relevant part, as "any officer or employee of a foreign government or any department, agency, or instrumentality…or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality." 15 U.S.C. § 78dd-1(f)(1). (Though under the Defendants' logic, the government could try to use that statute in matters involving former government officials, too, since it does not say "current" before "officer or employee".)  On the other hand, FEPA defines a "foreign official" to include any "senior foreign political figure" as defined in the FinCEN money laundering regulations.  18 U.S.C. § 201(a)(4).  Those regulations

define a senior foreign political figure as "current or former" officials (listing a series of such officials). 31 C.F.R. § 1010.605(p). Thus, Congress has no trouble identifying where it wants former officials included among those targeted by a statute, and exactly how to do that.

Defendants provide nothing other than conjecture to fill a self-manufactured void. They may wish Congress had applied Section 7031(c) to former "officials of foreign governments", but wishing does not make it so. Nor does the fact that in 2018, without reason, Defendants decided they would stretch Section 7031(c) beyond its plain meaning. Even if this key term could be said to be ambiguous, *Loper* places in the Court the task of properly defining that term, and the Court neither owes deference, nor should it show deference, to an agency that has no particular expertise with respect to that interpretation. Moreover, given the import that *Loper* places on recognizing the constitutionally based roles of each of the three branches, the Court should decline the State Department's expansive reading in favor of the "best" interpretation.

**IV.    *Loper* Makes Clear That Statutory Interpretation Cannot be Nonjusticiable**

The parties previously briefed the Defendants' nonjusticiability argument, which they rely on in an attempt to avoid scrutiny of their actions. *Loper* is also relevant to those assertions. The nonjusticiability position rests on the notion that courts may not consider even legal transgressions by the State Department, so long as the Department's action relates (in almost any way) to the question of entry. Relying on this proposition, Defendants appear to posit that the Court may abandon its constitutional role. *Loper* shows that this proposition is flawed.

The Supreme Court makes clear that the constitutional mandates that require the result in *Loper* apply beyond cases where *Chevron* deference may have applied:

> Courts, after all, routinely confront statutory ambiguities in cases having nothing to do with *Chevron*—cases that do not involve agency interpretations or delegations of authority. Of course, when faced with a statutory ambiguity in such a case, the ambiguity is not a delegation to anybody, and a court is not somehow relieved of its obligation to independently interpret the statute. Courts in that situation do not

> throw up their hands because "Congress's instructions have" supposedly "run out," leaving a statutory "gap." *Post*, at 2294 (opinion of KAGAN, J.). Courts instead understand that such statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning. That is the whole point of having written statutes; "every statute's meaning is fixed at the time of enactment." *Wisconsin Central Ltd. v. United States,* 585 U. S. 274, 284 (2018) (emphasis deleted). So instead of declaring a particular party's reading "permissible" in such a case, courts use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity.

*Loper*, 144 S. Ct. 2266.

Plaintiffs acknowledge that certain decisions by other judges in this Court concluded that a determination under Section 7031(c) is akin to a consular decision to deny entry. *See, e.g.*, *Doshi v. Blinken*, No. 23-3613, 2024 WL 3509486 (D.D.C. July 22, 2024); *Rahmani v. Yellen*, No. 24-cv-0285, 2024 WL 1701681 (D.D.C. Apr. 19, 2024). These cases are readily distinguishable and do not impinge upon this Court's ability to construe the statute in relation to the question at issue in this case – whether State exercised its authority appropriately. *Doshi* did not consider the question of the State Department's authority to take action under Section 7031(c) against a former official, while *Rahmani* considered the issue but applied circular reasoning—that because the *result* is denial of entry, it is irrelevant whether the Department gets there in accordance with the authority granted it. *Rahmani*, 2024 WL 1701681, at *26–30. The *Rahmani* court unilaterally determined that the plaintiffs there lacked standing to challenge the government's illegal actions solely because they had not undertaken the futile act of attempting to enter the US after they had been informed they were not eligible for entry. *Id.* Relying heavily on the fact that the plaintiffs asserted reputational harm, the court concluded "a decision from the Court endorsing Plaintiffs' position would do nothing to contradict the factual basis of State's public assessment that the Rahmanis have been involved with significant corruption." *Id.* at *28. Unfortunately, the *Rahmani* court overlooked the fact that Section 7031(c) is unique among all such statutes precisely because it authorizes the *publication* of the names of the persons against whom the statute is

asserted.  Unlike private designations, where the punishment is limited to prevention from entry, a public designation adds a unique weapon wielded against the designated person.  Plaintiffs respectfully suggest that the *Rahmani* court mistakenly deferred to the agency even as to erroneous legal interpretation of the statute solely because the factual reason for the agency's determination (*i.e.*, the determination that the plaintiff engaged in corruption) could not be challenged.  This abdication of the traditional judicial role was improper then and is made clearly improper by the Supreme Court's guidance in *Loper*.

Contrary to the *Rahmani* court's view, "shaming" was an exact purpose for the amendment to Section 7031(c) allowing for publication.  As Plaintiffs described previously, Congress added this provision specifically to allow such designations to be made public, since the prior versions of Section 7031(c) were subject to the INA's confidentiality requirements.  Pls.' Br. at 36–37. Moreover, by extrapolating that the plaintiff there had to seek to defy the designation to have standing, the *Rahmani* court ignored the fundamental question whether the agency even had the authority to undertake the action—and that it is the very designation itself that created the cause of action, not the denial of entry.

The *Rahmani* court exacerbates its error when it summarily decides that delisting would have no impact on the plaintiff because he was subject to OFAC sanctions.  The truth is quite the opposite, and while not directly a question raised in *Loper*, Plaintiffs believe that *Loper* is instructive in this regard because it cautions against courts too quickly abandoning their constitutional responsibility to ensure that agencies abide by the statutes that instruct them.  Under the reasoning of the *Rahmani* decision, the Department could declare that it wished to use Section 7031(c) against any and every person it chose, without regard to the restrictions in the act itself,

and the court is powerless to act against that action.[4]   So long as the targets were non-citizens, Section 7031(c), according to the *Rahmani* court, has no limits.   If the Department decided that officials of a foreign government included people employed just one day by a foreign government company, according to the *Rahmani* court, no judge can review that decision.   Through unbridled discretion, the *Rahmani* court would allow no checks whatsoever on the State Department's ability to publicly shame people using Section 7031(c).

Moreover, no party could ever have standing to challenge the illegal action because once it was placed on the Section 7031(c) list for the whole world to see, there would be no reason to undertake the futile act of seeking entry.   Standing should not rely on tilting at windmills.   Rather, it is clear that any person subject to worldwide condemnation via the broadcasting of a decision under Section 7031(c), immediately has standing to want to be removed from that list, especially if they should never have been considered eligible for action under it.

Plaintiffs submit that the abdication of judicial responsibility evident in the *Rahmani* decision represents the type of action that the Supreme Court reined in with *Loper*.

---

[4]      Carried to an extreme, the *Rahmani* decision might authorize the State Department to declare all persons illegally entering via the southern border using the services of a Mexican cartel subject to publication and entry denial under Section 7031(c) because dealing with and paying the cartel constitutes "significant corruption".   If the Department summarily (and likely wrongly) concluded that all such entrants were "officials of a foreign government" that determination is not reviewable under *Rahmani*. According to the *Rahmani* decision, every aspect of the State Department's action is nonjusticiable, and a plaintiff could not contest the State Department, whether made before or after physical entry (since the entry that did occur was illegal in any event).   Moreover, *Rahmani* would thus allow for the publication of the names, addresses and other personal information of every such person, and would require exclusion of all family members as well, whether they entered illegally or not, and whether they had any role in the corrupt actions.   While this discussion uses *reductio ad absurdum*, insulating Section 7031(c) from any and every abuse has that result.   For this reason, the Court should not follow *Rahmani* or its logic.

**V.    *Loper* Requires the Court to Interpret Section 807's Procedural Requirements**

Although Defendants did not directly assert *Chevron* deference with respect to their actions under Section 807, *Loper* nonetheless provides guidance with respect to how the Court should address this issue, and therefore Plaintiffs address that issue here.[5]  Plaintiffs' undue delay claims require the Court to consider whether OFAC's dilatory tactics have the effect of nullifying the rights granted in Section 807.  That Section requires OFAC to review a request for reconsideration of a sanctions designation, but provides no time limits for OFAC action, as Defendants emphatically pointed out in their earlier briefing.

Despite proclaiming that they are not subject to any timelines at all, in fact, *Kisor* and the cases that precede it, make clear that agency action must be "reasonable."  Where the agency has not provided any applicable standards, the courts must decide whether the agency has acted reasonably, or, in the context of interpreting its regulation, whether that interpretation is reasonable.  *Kisor*, 588 U.S. at 576 ("Under *Auer*, as under *Chevron*, the agency's reading must fall 'within the bounds of reasonable interpretation.' *Arlington v. FCC*, 569 U. S. 290, 296 (2013) . . . . And let there be no mistake: That is a requirement an agency can fail.")

Plaintiffs are not aware of any rulemaking or similar action by OFAC interpreting a reasonable time period under Section 807.  The *Kisor* Court made clear, however, that "an agency's reading of a rule must reflect 'fair and considered judgment' to receive *Auer* deference." 588 U.S.

---

[5]    Defendants' prior briefing conflates Plaintiffs' claims of undue delay with the merits of Plaintiff's designation.  As made clear in Plaintiffs' prior briefs, Plaintiffs claims rest on the undue delay in OFAC's acts.  Moreover, Plaintiffs specifically requested the opportunity to brief the merits should the Court determine that it was appropriate to address that issue, and Plaintiffs requested that the Court undertake, in accordance with its prior rulings in similar cases, a review of Defendants' over-redaction of the administrative record before insisting that Plaintiffs brief that issue, since Plaintiffs remained largely in the dark as to the specifics of the designation bases.

at 579 (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997))).  In particular, "a court should decline to defer to a merely 'convenient litigating position' or 'post hoc rationalizatio[n] advanced' to 'defend past agency action against attack.'" *Id.*  (quoting *Christopher*, 567 U.S. at 155).  Thus, the Court should interpret Section 807 to determine what constitutes a reasonable amount of time under that provision, taking into consideration the fact that OFAC's review occurs in a post-deprivation environment.   Moreover, since OFAC's internal processes call for the preparation of an "evidentiary memorandum" *before* a designation is made,[6] the Court should consider whether the time OFAC takes to respond to requests for administrative records (in this case more than 15 months) is reasonable or, more aptly, whether it contributes to the undue delay.

The deference briefed previously by Defendants applies to the agency's *factual* decisions, and not to its regulatory interpretation.  Because interpretation of Section 807 requires no particular agency expertise, *Loper* emphasizes that the court, and not the agency, is the proper arbiter of both the meaning of the regulation and whether the agency abided by it.  *Accord Kisor*, 588 U.S. 558. OFAC's delays in providing the administrative record and in rendering a decision indicate an unacceptable nonchalance toward the procedural responsibilities in Section 807.  OFAC does not justify why it takes 15 months to produce one or two substantive paragraphs that reference two public sources, while redacting 90% of the remaining information.  The delay is particularly acute where Plaintiffs specifically requested production of that record on a "rolling" basis.  OFAC has

---

[6]    "The findings and conclusion of that investigation are then documented in a formal evidentiary memorandum that sets out the evidence pertaining to a determination that the person meets one or more of the criteria specified in the sanctions authority." U.S. Dep't of the Treasury, *Filing a Petition for Removal from an OFAC List*, at Q.6, located at https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-an-ofac-list.

not explained, and claims it has no need to explain, why the portions ultimately produced could not have been produced immediately, given there is no attempt to be discerning in its redaction.

Everything in OFAC's actions indicate that its delay is strategic and intentional—to make the process as much a punishment as the designation itself.  Only when pressed through litigation did OFAC provide the long-promised record and decision.  The agency's actions make clear that rather than honoring the spirit and intent of Section 807, OFAC uses that provision to make the process the punishment.  *See* Malcolm M. Feeley, *The Process Is the Punishment*: *Handling Cases in a Lower Criminal Court*, (1979) [hereinafter *The Process Is the Punishment*].

## VI.    The Court Should Interpret Section 807 to Require Timely Action by OFAC

In his seminal work *The Process Is the Punishment*, Malcolm Feeley describes how in a trial court in Connecticut, the process defendants face is so punishing, that defendants avoid the process, even if they might not be guilty.  In *The Process Is the Punishment: How the Criminal Legal System Punishes Those Presumed Innocent*,[7] the Partnership for Justice outlines how the criminal justice system uses time and pre-conviction process to inflict as much or more harm on suspects, leaving even the innocent "punished" in the process.  The notion of the process acting as the punishment is one in conflict with basic principles of the Rule of Law.  In settings where parties must expend time and money because they have been punished before they have an opportunity to challenge the enforcer's action, long, drawn-out processes become punishment.

---

[7]    Partners For Justice, *The Process is the Punishment: How the Criminal Legal System Punishes Those Presumed Innocent* (June 2013), https://assets-global.website-files.com/6082d94f16ba7348d54d034d/653a98e1d8418b592e8e65c9_The%20Process%20is%20the%20Punishment%20(updated).pdf.

In the world of sanctions, where parties are deprived of any pre-sanction opportunity to engage with the enforcers, every day that the process is drawn out is another day of punishment. To that end, substantial delays become more than just mere administrative inconveniences. Instead, the process itself inflicts and continues the punishment.  If it takes two to five years to obtain reconsideration, then that is two to five years where the punishment has been imposed.

This notion is relevant because Plaintiffs believe it should inform the Court's views as it analyzes whether OFAC's delays are reasonable, and whether those delays act to vitiate the procedural rights provided in Section 807.  If OFAC can take any amount of time it wishes to review a request for reconsideration, then there is no real right to reconsideration, and Section 807 is meaningless.  This is a result that, under *Loper*, cries out for judicial oversight.  An agency's ability to delay must be subject to reasonable standard.  Where that delay is post-deprivation, those standards should be more acute.  The United States recently promoted a resolution at the United Nations requiring timelines and stricter limits on the time it takes the UN to review sanctions delisting requests.  S.C. Res. 2744 (July 19, 2024), https://www.un.org/en/media/accreditation/pdf/SCRes1.pdf.  The UN's Security Council recognized this as a necessary element for a Rule of Law system.  This Court should not interpret Section 807, which it must do under *Loper* and *Kisor*, as requiring less.

## CONCLUSION

For the reasons discussed here and in Plaintiffs' briefs, the Court should deny the Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

Dated:  September 6, 2024                Respectfully submitted,


                                        /s/ Kenneth J. Nunnenkamp
                                        KENNETH J. NUNNENKAMP (Bar No. 420914)
                                        Morgan, Lewis & Bockius, LLP
                                        1111 Pennsylvania Avenue, N.W.
                                        Washington, DC 20004
                                        Tel: (202) 739-6000
                                        Fax: (202) 739-6001
                                        E-mail: kenneth.nunnenkamp@morganlewis.com
                                        Counsel for Plaintiffs